Mark A. Baker
Cory J. Swanson
**ANDERSON, BAKER & SWANSON, PLLC**
One South Montana Avenue, Suite L-1
Helena, MT 59601
Tel: (406) 449-3118
Fax: (406) 449-0667

Joseph W. Cotchett (*Pro Hac Vice*)
Mark C. Molumphy (*Pro Hac Vice*)
Nancy L. Fineman (*Pro Hac Vice*)
Matthew K. Edling (*Pro Hac Vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MONTANA**

**MISSOULA DIVISION**

| | |
|---|---|
| **H. Martin Klinker, Jr.,**<br>**Rocking K Land and Cattle, Inc.,**<br>**Philip Timothy Johnson,**<br>**Wade Jacobsen**,<br>**all individually and on behalf of all those**<br>**similarly situated**<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>**JPMorgan Chase & Co.,**<br>**PricewaterhouseCoopers LLP,**<br>**Jon S. Corzine,**<br>**Christine A. Serwinski, and**<br>**David Simons**<br><br>　　　　　Defendants. | Case No. _____<br><br>**CLASS ACTION**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.     **INTRODUCTION** ....................................................................................................... 1

II.    **MF GLOBAL FRAUDULENTLY INDUCED PLAINTIFFS**
       **AND CLASS MEMBERS** ........................................................................................ 3

III.   **JURISDICTION AND VENUE** .............................................................................. 6

IV.    **PARTIES** ................................................................................................................... 7

       A.    Plaintiffs ............................................................................................................ 7

       B.    Defendants ........................................................................................................ 8

             1.    Bank Defendant .................................................................................... 8
             2.    Auditor Defendant ............................................................................... 8
             3.    Individual Defendants .......................................................................... 8
             4.    Non-Party .............................................................................................. 9
             5.    Agents and Co-Actors ......................................................................... 10

V.     **FACTUAL ALLEGATIONS** ................................................................................. 10

       A.    Corzine Utilized His Goldman Sachs' Connections To
             Lobby the CFTC To The Detriment of Plaintiffs and Class Members ................. 10

       B.    MF Global's History of Regulatory Problems ........................................... 12

       C.    MF Global's Reliance on Repos .................................................................... 13

       D.    The SEC Investigated MF Global's Repo Transactions ........................... 18

       E.    MF Global Is Caught Misappropriating Client Funds ............................. 19

       F.    MF Global's Actions Were Fraudulent and In Violation
             of Federal Regulations .................................................................................. 21

       G.    MF Global Misrepresented The Security of
             Customer Segregated Accounts .................................................................... 22

       H.    JPMorgan Failed to Perform Its Statutory Duties ................................... 26

       I.    PwC, MF Global's Auditor, Provided False Reports ................................ 32

             1.    PwC's Duties Pursuant to Professional
                   Auditing Standards .............................................................................. 33
             2.    PwC Violated CFTC Rules ................................................................. 35
             3.    Plaintiffs and Class Members Reasonably
                   Relied on PwC'sMisrepresentations .................................................. 38

       J.    Defendants Aided and Abetted MF Global's Breaches Of Fiduciary Duty ........ 39

VI.    **CLASS ALLEGATIONS** ...................................................................................... 43

VII.   **CLAIMS FOR RELIEF** ........................................................................................ 46

FIRST CLAIM
Aiding and Abetting Breach of Fiduciary Duty
Against All Defendants ................................................................................. 46

SECOND CLAIM
Conversion
Against the Individual Defendants ................................................................. 49

THIRD CLAIM
Aiding and Abetting Conversion
Against All Defendants ................................................................................. 50

FOURTH CLAIM
Fraud
Against Individual Defendants ..................................................................... 52

FIFTH CLAIM
Negligent Misrepresentation
Against Individual Defendants ..................................................................... 53

SIXTH CLAIM
Interference With Contract Rights
Against the Individual Defendants and JPMorgan ......................................... 54

SEVENTH CLAIM
Violations of the Commodity Exchange Act
Fraud: 7 U.S.C. § 6b(a)
Against the Individual Defendants ................................................................ 55

EIGHTH CLAIM
Violations of the Commodity Exchange Act
Aiding and Abetting
Against All Defendants ................................................................................. 57

NINTH CLAIM
Violations of the Montana Unfair Trade Practices and Consumer Protection Act
Against Individual Defendants ..................................................................... 60

VIII.   **PRAYER FOR RELIEF** ....................................................................... 61
IX.     **JURY DEMAND** ................................................................................. 61

**Everyone has opinions.  We have convictions**.
Proclamations are common on Wall Street.
But they are meaningless if you don't stand by your words.
*– 2011 MF Global Print Advertisement*

Plaintiffs H. Martin Klinker, Jr., Rocking K Land and Cattle, Inc., Philip Timothy Johnson, Wade Jacobsen ("Plaintiffs") bring this action individually and on behalf of all persons and entities, except Defendants and their affiliates, who held futures accounts with MF Global Inc., the registered Futures Commission Merchant ("FCM"), broker-dealer ("BD"), and wholly owned subsidiary of MF Global Holdings, Ltd., (together with MF Global Inc. referred to as "MF Global" or the "Company"), and who were damaged by the misappropriation of their funds as revealed when MF Global became the subject of liquidation and bankruptcy proceedings. Plaintiffs bring this action as a class as defined below on behalf of Montana clients, as well as those nationwide.

Plaintiffs allege the following based on their investigation and the investigation of counsel.  The investigation included a review and analysis of press releases, media reports, company reports and presentations, testimony provided to Congress, and SEC filings.

I.      **INTRODUCTION**

1.      This action arises from the collapse and subsequent bankruptcy filing of MF Global – the 8th largest bankruptcy in history – and the loss of over $1.2 billion from commodities futures accounts that were represented by the Company to be segregated and secure.  This massive breach of trust epitomizes the very problems that brought the global financial system to the brink of collapse in 2008.  Very little has changed on Wall Street, with the rating agencies which evaluate firms, or with the regulators in Washington D.C. that are supposed to protect the public.  There continues to exist the same strained leverage, excessive risk taking, and focus on short term profits at the expense of stakeholders.  This case is about the insatiable greed that led a Wall Street broker-dealer to take inconceivable risks, and the sad reality that it is the customer, the client, and the public, that inevitably bear the brunt of the financial consequences.

1

2.      This theft was carried out by sophisticated financial entities that professed superior business acumen.  However, once over $1.2 billion in customer accounts was unaccounted for, the Defendants were quick to bury their heads deep in the sand.  Investigations and testimony stemming from MF Global's collapse have only confirmed that Defendants disregarded the best interests of their clients and stakeholders.

3.      Since at least March 2010, MF Global executives, including former MF Global CEO Jon Corzine ("Corzine"), increased the Company's appetite for risk in its investment activities.  Corzine – a former CEO of Goldman Sachs – was obsessed with making MF Global a "major player" on Wall Street.  Following his 11-year sabbatical from the industry, Corzine led the charge to dramatically increase leverage at MF Global through high risk repurchase agreements and trading (the "European Transactions") in the risky sovereign debt of European countries ("Eurozone Debt").  Corzine launched this strategy with full knowledge that excessive leveraging and large investments in risky assets prompted the failures at Bear Stearns and Lehman Brothers, and threatened the viability of European banks.

4.      Indeed, MF Global's decision to place a multi-billion dollar bet on the strength of European sovereign debt was critical to Corzine's plan to transform MF Global from a focused, institutional commodities broker to a "premier" investment bank.  This multi-billion dollar gamble failed miserably when the Eurozone Debt – most notably from Spain, Italy, and Portugal – suffered ratings downgrades and rapid decreases in value.

5.      Most troubling, MF Global financed its gamble by siphoning funds from segregated client accounts to cover its obligations, including its $1.5 billion debt to JPMorgan Chase & Co. ("JPMorgan").  The amount of funds misappropriated from segregated accounts exceeds $1.2 billion.  To this day, MF Global, its officers, JPMorgan, and its auditor PricewaterhouseCoopers LLP ("PwC") have not provided a reasonable explanation as to how this colossal theft could have taken place.

6.      Although widely reported as a "sudden" and "swift" collapse, the MF Global story actually began long prior to its collapse, and came to light only because of consistent

2

failures by MF Global's banking partners and MF Global's auditor (PwC) to perform their statutorily mandated duties. Recently, Neil Barofsky, former special inspector for the U.S. Treasury's Troubled Asset Relief Program, spoke with Bloomberg about Corzine's testimony before the House Financial Services sub-committee:

> **After now enduring three days of testimony, it looks more and more likely a fraud happened. There was a fraud at MF Global, you look at the chronology and the information that was provided by CME, there is a strong indication they took customer money, they used it to send it over to broker-deal accounts, and they used it meet liquidity concerns.**

7.      While questions still remain unanswered, this much is clear: MF Global's fraud and the subsequent bankruptcy and freezing of client accounts has jeopardized the livelihoods of Americans, including farmers, grain producers, and ranchers throughout the Country.

## II.     MF GLOBAL FRAUDULENTLY INDUCED PLAINTIFFS AND CLASS MEMBERS

8.      MF Global expressly represented in uniform written presentations that customer funds would be segregated from those used to fulfill MF Global's own obligations or liabilities and would be kept safe in the event of MF Global insolvency. However, MF Global failed to disclose that regulated, protected, customer-segregated accounts at MF Global could be depleted and the funds moved to unprotected, unregulated, non-segregated accounts. Plaintiffs and class members relied on these knowingly false statements and were thereby fraudulently induced to enter into contracts with MF Global, or its predecessor Man Financial. Plaintiffs were entitled to rely on these written material representations. At all times, MF Global and its officers knew that Plaintiffs and class members would rely on these written representations. At all times, Plaintiffs and class members were ignorant of the true facts and have been injured as a consequence of this fraudulent inducement.

9.      Plaintiffs and class members uniformly received a written document titled "**Managed Futures Today Safeguarding Customers Through Segregated Funds**." The document falsely promised all funds would be kept segregated and secure even if MF Global was insolvent. For example, the document stated that:

3

> **In recent years, many investors found out the hard way they have
> very little recourse to recover funds in the event of a financial firm's
> bankruptcy.  Although the Bernie Madoff "hedge fund" was by far
> the highest profile case, there were numerous less publicized
> bankruptcies and defaults at other firms and investments (including
> legitimate ones), in which investors found recouping remaining funds
> difficult or impossible.**  Sometimes it's a case of being the last in line of a
> long list of creditors, a problem that's compounded when customer funds
> aren't separated from a firm's funds.  Such 'commingled' funds might
> have been used to fund the firm's operating expenses or in its own trading.
> If a firm enters bankruptcy, it can be very difficult or impossible to
> recover customer funds that were commingled in such a fashion.
>
> . . .
>
> However, all futures trading accounts, including managed futures, have
> the advantage of specific industry rules that require the segregation of
> customer funds from the firm's own funds.  The practice of segregating
> customer funds protects investors in the event of default at the Futures
> Clearing Merchant (FCM), the industry term for futures brokerage firms
> licensed to trade on futures exchanges in the U.S. holding their account.
>
> . . .
>
> While FCM bankruptcies are rare, they do occur.  In 2005, Refco Inc. and
> 23 of its unregulated subsidiaries filed for Chapter 11 bankruptcy
> protection.  However, Refco's regulated subsidiaries (where customers'
> futures trading and managed futures accounts resided) were unaffected
> and customers were able to continue trading and managing their accounts.

10.    Additionally, Plaintiffs and class members uniformly received a written document

titled "**Protecting Your Assets at MF Global**" which stated in relevant part:

> **To ensure the integrity of your funds, MF Global follows stringent
> rules to separate your futures transaction assets from those used to
> fulfill MF Global's own obligations or liabilities.**  We hold client assets
> in a separate account that is legally and physically distinct from our own
> accounts.  **This client asset account is subject to rigorous accounting
> processes as well as regulatory reporting and auditing.**
>
> . . .
>
> When you transfer assets to MF Global, we place these funds in an
> account at a **bank insured by the Federal Deposit Insurance
> Corporation (FDIC).**  The bank designates this account as a separate
> "client omnibus account" and keeps the assets in this account completely
> segregated from accounts that hold the funds and investments of MF
> Global.
>
> . . .
>
> **We preserve the distinction between your assets and ours by holding
> your cash and securities within special reserve bank accounts
> established for the exclusive benefit of clients.**  Exacting accounting
> standards and internal supervision protocols govern these accounts to
> protect the integrity of client assets and separate from those of MF Global.

4

11.     Further, MF Global was required and failed to segregate client funds, including those of Plaintiffs and class members, in protected accounts.  Commodities Futures Trading Commission ("CFTC") Rule 1.20(a) underscores this fundamental precept:

> All customer funds shall be separately accounted for and segregated as belonging to commodity or option customers.  Such customers' funds when deposited with any bank, trust company, clearing organization or another futures commission merchant shall be deposited under an account name which clearly identifies them as such and shows that they are segregated as required by the [Commodities Exchange] Act and this part. . . . **No person . . . that has received customer funds for a segregated account . . . may hold, dispose of or use such funds as belonging to any person other than the option or commodity customers of the futures commission merchant which deposited such funds.**

12.     MF Global represented in uniform written policies that it followed stringent rules, including CFTC Rule 1.20(a) identified above, requiring client funds to be protected in segregated and protected accounts.  MF Global's stated that it would follow applicable regulations as well its own representations that it would segregate, protect, and not employ customer funds for its own obligations and liabilities.  These representations were preconditions for Plaintiffs and class members agreeing to contract with MF Global.  Plaintiffs and class members' basis for contracting with MF Global was predicated on the security of their funds both by MF Global's express representations and implicit adherence to the law.

13.     As detailed below, MF Global violated CFTC Rule 1.20(a) and the Commodities Exchange Act by failing to segregate, protect, and not employ customer funds.  MF Global, and its officers authored or ratified these uniformly false representations knowing they were false when they were made because as detailed below, MF Global was reliant upon customer funds to satisfy its debts and obligations.  Plaintiffs and class members relied on these written representations prior to contracting with MF Global or its predecessor.

14.     MF Global had reason to expect that Plaintiffs and all class members would reasonably rely on the separateness of their segregated customer accounts and the regulations and the protections that accompanied these accounts prior to contracting with MF Global.

15.     Had Plaintiffs and class members known that their funds would not be segregated or protected as stated in the written materials above, but instead used by MF Global for its own

benefit at the risk of and to the detriment of Plaintiffs and class members, they would not have placed their funds with MF Global.

16.     Plaintiffs and class members were fraudulently induced to sign customer account agreements with MF Global and place their funds with MF Global.  Therefore the contractual provisions between MF Global or its predecessor and Plaintiffs and class members are unenforceable.

## III.     JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 1332(d) and 1367(a), and 7 U.S.C. § 25(a)(1).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there is diversity of citizenship between the Plaintiffs and each of the Defendants.  This Court has supplemental jurisdiction over Plaintiffs' state law claims in that those state law claims are so related to Plaintiffs' federal claims that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

18.     The Court has jurisdiction over the Defendants by virtue of their nationwide contacts and business activities, including their extensive contacts and business activities in this district.

19.     Venue is proper in this District pursuant to 7 U.S.C. § 25(c) where certain of the acts and practices constituting violations of the Commodities Exchange Act occurred. Defendants transacted business, were found, or had agents in this District and a substantial part of the events, acts, omission and transactions complained of herein occurred in this District. Additionally, uniform written misrepresentations involving Plaintiffs' accounts occurred in this District.

/ / /

/ / /

/ / /

6

IV.     **PARTIES**

     A.     **Plaintiffs**

    20.     Plaintiff **H. Martin Klinker, Jr**., is a farmer operating out of Fairfield, Montana, doing business throughout the State of Montana.  Plaintiff retained MF Global as Plaintiff's FCM to provide execution, clearing and margin services in connection with futures and commodities trading activities.  As an FCM, MF Global was regulated by the US Securities & Exchange Commission ("SEC) and CFTC.  As a regulated entity, MF Global was required to maintain customer assets in regulated, customer-segregated accounts, such that these assets were protected, even in the event of MF Global's insolvency.

    21.     Plaintiff **Rocking K Land and Cattle, Inc**. is a corporation which raises cattle in Montana and does business throughout the State of Montana.  Plaintiff retained MF Global as Plaintiff's FCM to provide execution, clearing and margin services in connection with futures and commodities trading activities.  As a regulated entity, MF Global was required to maintain customer assets in regulated, customer-segregated accounts, such that these assets were protected, even in the event of MF Global's insolvency.

    22.     Plaintiff **Philip Timothy Johnson** is a grain grower operating out of Dutton, Montana and does business throughout the State of Montana.  Plaintiff retained MF Global as Plaintiff's FCM to provide execution, clearing and margin services in connection with futures and commodities trading activities.  As a regulated entity, MF Global was required to maintain customer assets in regulated, customer-segregated accounts, such that these assets were protected, even in the event of MF Global's insolvency.

    23.     Plaintiff **Wade Jacobsen** is a grain grower and cattle raiser operating out of Sun River, Montana and does business throughout the State of Montana.  Plaintiff retained MF Global as Plaintiff's FCM to provide execution, clearing and margin services in connection with futures and commodities trading activities.  As a regulated entity, MF Global was required to maintain customer assets in regulated, customer-segregated accounts, such that these assets were protected, even in the event of MF Global's insolvency.

### B.      Defendants

#### 1.      Bank Defendant

24.      Defendant **JPMorgan Chase & Co**. ("JPMorgan") is a Delaware corporation providing banking and financial services throughout the United States.  JPMorgan has offices and regularly transacts business throughout the Country.  JPMorgan is a multinational banking corporation and major provider of financial services, and is the largest bank in the United States by assets and market capitalization.  It provided corporate banking services to MF Global, and extended cash and credit to the Company, while simultaneously providing escrow account services to claim members and underwriting MF Global's February and August 2011 Convertible Offerings through its investment banking arm, JPMorgan Securities LLC.

#### 2.      Auditor Defendant

25.      Defendant **PricewaterhouseCoopers LLP** ("PwC") is a global professional services firm specializing in accounting and auditing services.  PwC is the world's largest professional services firm in terms of revenue and is one of the "Big Four" accounting firms. PwC served as MF Global's auditor at all relevant times.  This is not the first time that PwC has failed to monitor clients' segregating customer funds.  In 2008 PwC was fined millions of dollars for failing to properly monitor JPMorgan's customer fund segregation. PwC issued "clean" audit opinions on MF Global since 2007 despite its failure to properly audit the firm.

#### 3.      Individual Defendants

26.      Defendant **Jon S. Corzine** served as Chairman of the Board and Chief Executive Officer ("CEO") of MF Global Holdings and MF Global Inc., from March 2010 until November 2011, when he resigned.  Corzine is also the former Chairman and Chief Executive Officer of Goldman Sachs where he co-chaired the New York investment bank with Former Secretary of the Treasury, Henry Paulson.  It is reported that between 2010 and 2011 Corzine received total compensation in the amount of $16,176,772.

27.      Defendant **Christine A. Serwinski**, at all material times, served as the Chief Financial Officer of MF Global Inc. North America, and was directly responsible for its financial

operational reporting to self-regulatory and regulatory authorities, including the false reports hereinafter alleged. Serwinski was also the CFO for the North American Operations of Holdings. According to Corzine's December 8, 2011 testimony before the US House Agricultural Committee, the CFO of North American Operations oversaw the movement of customers' segregated account funds in North America.

28.     Defendant **David Simons**, at all material times, served as Senior Vice President and Head of Global Operations at MF Global Holdings. According to the December 13, 2011 written statement by MF Global's Chief Accounting Officer and controller Henri J. Steenkamp to the US Senate Agriculture Committee, the Head of Global Operations had responsibility for handling customer funds.

29.     Defendants' positions with the Company as Officers gave them unparalleled and confidential access to undisclosed information about MF Global's business, operations, and other proprietary information. Each of the Defendants, by virtue of their positions with the Company, directly participated in the management of the Company, was directly involved in the Company's day-to-day operations, and privy to confidential proprietary information concerning the Company, including the investments which lead to MF Global's collapse.

### 4.     Non-Party

30.     Prior to its bankruptcy, MF Global Holdings consisted of approximately forty-five corporations spread across the globe, including MF Global Inc., making the Company one of the world's largest merchants/brokers in the markets for commodities and listed derivatives. During the Class Period, MF Global acted as a broker in markets and commodities and listed derivatives. At all relevant times, MF Global was registered with the CFTC as an FCM and with the SEC as a broker-dealer. At the time of the collapse, the Company was attempting to become an investment bank.

31.     MF Global had access to more than seventy exchanges globally and was one of twenty primary dealers authorized to trade U.S. government securities with the Federal Reserve Bank of New York. By virtue of being designated a primary dealer, MF Global was able to tap

government funds provided by the Federal Reserve of New York.  MF Global is an interested party in this litigation and is not named as a Defendant because of the automatic stay provision of United States Bankruptcy Code § 362.

### 5.   Agents and Co-Actors

32.    Defendants, and each of them, are individually sued as participants, co-conspirators, and aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

## V.   FACTUAL ALLEGATIONS

### A.   Corzine Utilized His Goldman Sachs' Connections To Lobby the CFTC To The Detriment of Plaintiffs and Class Members

33.    MF Global operated as a clearing broker for commodities trades, providing exchange-traded derivatives (futures and options) and over-the-counter products such as contracts for difference (CFDs), foreign exchange, and spread betting.  All together, the Company provided access to at least 70 exchanges globally.  It was known as MF Global Ltd., until January 2010, when it changed its name to MF Global Holdings Ltd. and changed its corporate domicile from Bermuda to Delaware in a bid to become a "primary dealer" with the New York Federal Reserve Bank.

34.    MF Global's clients constituted a cross-section of people and entities from all over the world: farmers who hedge their crops, oil producers who use futures to lock in prices and take delivery of physical commodities, and retirees and pension funds who invest in futures to diversify their portfolios.  When performed according to regulations governing the industry, futures trading stabilizes world prices.

35.    Based on preliminary reports of the liquidation of the FCM unit of MF Global, MF Global misappropriated funds from approximately 38,000 customers.  As CME Executive Chairman Terrance A. Duffy and CEO Craig S. Donohue stated on December 9, 2011:

> The impact of MF Global's misconduct is significant for farmers,
> ranchers, grain cooperatives, miners and other commodity consumers,

10

producers and end-users who use commodity price hedging as an integral part of their businesses.

. . .

**The fact of the matter is that MF Global broke a number of rules and obligations to protect customer funds, resulting in customer losses.  To be clear, transfers of customer funds, made by MF Global for the benefit of that firm, are very serious violations of our rules and of CFTC regulations.**

36.     In 2007, MF Global reported revenues of $4 billion from interest it earned on the customer funds it held against outstanding trades.  However, in the aftermath of the 2008 global financial storm, and with interest rates approaching near-zero in parts of the world, revenue plummeted.  MF Global was far from being able to achieve Corzine's fantasy of becoming a Wall Street powerhouse.  Instead, the Company grew through Corzine's political lobbying and the commingling and looting of customers' segregated accounts.

37.     Months before MF Global collapsed, Corzine, a former United States Senator and New Jersey Governor, actively lobbied against the CFTC's proposed rule that would have restricted the very transactions that "allowed" MF Global to **borrow** money from its customers to finance the firm's operations.  CFTC Chairman Gary Gensler's membership in the "Goldman Sachs fraternity" made the CFTC's capitulation to Corzine's requests as unsurprising as it was disturbingly familiar.

38.     As appropriately stated by U.S. Congressman Tom Rooney last month:

Congressman Tom Rooney (R-FL): "It seems like we have an agency that saw a risky behaviour and tried to impose a rule, **then people like Corzine pushed back – and your boss used to work for Corzine** – and you all did back off.  Now, in retrospect, your agency is trying to go back in and enforce that rule and it's too late for the people that lost their shirt under MF Global".

39.     Instead of answering the criticisms of his abdication of responsibility and conflicts of interest, Gensler has refused to testify before Congress and recused himself from the CFTC's investigation of MF Global.  According to Nebraska Senator Mike Johanns: "To me, it looks like **you're ducking the responsibilities of your job**," "When this got uncomfortable, because money isn't there that should be there, and for whatever reason you folks didn't discover that until it looks like it's too late, you don't want to come up here and answer questions."

11

40.     According to MF Global's written representations, none of this should have happened.

**B.      MF Global's History of Regulatory Problems**

41.     By becoming a primary dealer, MF Global served as a partner with the Federal Reserve Banking System, enabling it to obtain greater access to cheap capital from the Federal Reserve.  Unfortunately, once MF Global earned its status as a primary dealer, it was emboldened to take even greater risks.

42.     According to Congressional testimony recently provided by New York Federal Reserve Bank (the "NY Fed") Executive Vice President and General Counsel Thomas Baxter, the journey to primary dealer status started for MF Global in December 2008, when Donald Galante, head of Finance, Trading and Fixed Income Sales at MF Global, initiated contact with the NY Fed.  In January 2009, Galante and other MF Global representatives met with representatives from the NY Fed.

43.     Meanwhile, the CFTC advised the NY Fed that it was considering certain disciplinary orders against MF Global in response to control and risk management issues at the Company.  The NY Fed postponed approval of MF Global as a primary dealer until the CFTC rendered its disciplinary findings.  Over the next six months as they awaited the findings, MF Global repeatedly contacted the NY Fed to pressure it to approve its primary dealer status.  Each time, the NY Fed declined.

44.     On December 17, 2009, the CFTC found MF Global had failed to: (1) supervise a trader's activities; (2) transmit accurate prices in options positions; (3) prepare proper and accurate trading cards; and (4) maintain written records in at least one client file.  The CFTC fined MF Global $10 million and required that MF Global improve its control and risk management practices by enacting policies and procedures to enhance risk monitoring procedures, training, compliance procedures and compliance audit procedures.

45.     In January 2010, MF Global unsuccessfully argued that the CFTC order, which called for an overhaul of MF Global's internal controls, was immaterial to the Company's

application for primary dealer status.  At this same time, the NY Fed revised its primary dealer policy to state that, among other things, any applicant that had been the subject of regulatory discipline could not be a primary dealer for at least one year following the discipline. Undeterred, MF Global sent in an application in January 2010, and demanded a meeting, which occurred in February 2010.

46.     In March 2010, Corzine became CEO of MF Global.  Corzine's single-minded obsession was to turn the Company into an investment bank like his former employer, Goldman Sachs.  Because, Corzine had not come directly from another financial institution and had been out of the industry for 12 years, FINRA rules required him to take Series 7 and Series 24 exams. However, Corzine sought and obtained **a waiver from these rules** – meaning that he was now serving as head of the country's largest commodities broker without a license.

47.     In June 2010, Corzine and MF Global officials met again with the NY Fed, and throughout the summer and fall of 2010, the NY Fed continued to gather information regarding MF Global's application to become a primary dealer.  According to Baxter's testimony, the NY Fed inquiries were "heavily focused on credit issues arising out of the financial and liquidity position of the broker dealer relative to the corporate entity at large."

48.     Ultimately, on February 2, 2011, after years of persistence and political influence, MF Global became a primary dealer and the floodgates of cheap government funds opened.

### C.     MF Global's Reliance on Repos

49.     MF Global, like Lehman and Bear Stearns, relied heavily on short-term lending arrangements called repurchase transactions, also known as "repos."  Repos – used by many banks to increase leverage – involve the sale of a security to a counterparty, together with a concurrent commitment by the seller to repurchase the security at a later date.  In return for "selling" the securities, the seller receives cash and incurs an obligation to repurchase the securities at a later date, sometimes only twenty-four hours, for a greater price – effectively representing the "interest" (also known as the "repo rate").  A repo is thus analogous to a secured

loan where the buyer receives securities as collateral and the seller receiving the purchase price as the loan principle.

50.    Many repo transactions are bilateral and negotiated privately between two parties. In the tri-party market, a party (JPMorgan in many cases here) sits in the middle of each deal, settling transactions and valuing and managing collateral.  JPMorgan performed such services for MF Global and served as a clearing bank for the tri-party repurchase market.

51.    Because MF Global amassed a massive portfolio in distressed Eurozone bonds there was enormous incentive to move these distressed assets from the balance sheet using repo transactions.  First, according to MF Global's quarterly report, the Company was able to "de-recognize" around $14.5 billion in troubled assets for the first quarter of 2011 alone simply by moving the assets off of its balance sheet and into repos.

52.    Second, MF Global took advantage of a loophole in United Kingdom leverage rules to "re-hypothecate" client assets, and gain access to billions more in repo funding.  The most classic example of hypothecation is when an individual takes out a mortgage to purchase a home.  The mortgagor pledges the home as collateral for the promise to pay back the mortgage. The collateral (the home) is "hypothetically" owned by the bank, which as the lender, has the right to take possession of the collateral in the event of the mortgagor's default.

53.    At MF Global, the Company actively "re-hypothecated" segregated client funds – that were already pledged as collateral to cover futures transactions – by re-using the funds a second time as collateral for its own proprietary trading in repos.  MF Global used client funds and proceeds from the repos to purchase even more distressed Eurozone assets that were in turn pledged as collateral to borrow more until MF Global was over-leveraged and ridden with $6.3 billion in toxic assets.

54.    There are myriad problems that can arise from the extensive use of repo transactions to finance activities, especially when they are structured using distressed assets.  For example, MF Global needed to maintain enough capital to conduct its business and cover margin calls from repo counterparties.  MF Global was required to post additional collateral whenever

there were decreases in the value of collateral pledged for repo transactions.  The decreases in value of MF Global's portfolio of Eurozone Debt, which was often posted as collateral in repo transactions, would thus trigger collateral calls at MF Global.  In fact, Corzine testified before the US Senate Agriculture Committee on December 13, 2011, that MF Global faced massive margin calls twice a day.

55.    A failure to post additional collateral can result in a default on the repo and require MF Global to liquidate the transaction.  During times of distress the collateral calls can cripple a firm that is thinly capitalized and an ensuing liquidity crisis can force a company into bankruptcy.

56.    This is exactly what precipitated the failures of Bear Stearns and Lehman Brothers, and required an unprecedented government bailout of American International Group ("AIG").  Just as these failed firms experienced, changing economic and other market conditions can trigger margin calls that require the posting of additional funds, which a company may not have readily available.  Credit downgrades from rating agencies exacerbate the situation causing further margin calls.

57.    By MF Global's design, the Eurozone bonds used in the repo transactions matured at the same time as the financing, so that money received from redeeming the bonds could be used to pay for the repurchase of the bonds under the repo.  These so-called "repo to maturity" bonds were off-balance sheet devices that exposed MF Global to massive exposure in the event the value of the Eurozone bonds that were posted as collateral dropped in value.  MF Global's extensive use of off-balance sheet devices as a cheap source of short-term funds – known as the "shadow banking system" – allowed for MF Global to increase its potential exposure to an amount that was many times greater than its total asset base.

58.    In December 8, 2011 testimony before the US House Agriculture Committee, Corzine described the repurchase-to-maturity ("RTM") transactions in the sovereign debt of distressed European countries as follows:

15

There has been extensive comment about a series of positions entered into by MF Global that involved 'repurchase transactions to maturity,' known colloquially as 'RTMs.' I would like to address those here.

As relevant here, repurchase transactions (also known as "repos") worked roughly as follows: MF Global would purchase a debt security (such as sovereign debt) from a seller and would sell the same security to another party (the "Counterparty"), with an agreement to repurchase the security from the Counterparty at a later date. The agreement between MF Global and the Counterparty to sell and buy back the debt security was the repurchase agreement, and it served, in effect, as a loan from the Counterparty to MF Global. The Counterparty would hold the debt security as collateral for the loan.

59.     MF Global only invested in Eurozone bonds maturing prior to 2013 because all of these bonds were guaranteed by the European Financial Stability Facility ("EFSF") and the EFSF was set to expire that same year. MF Global interpreted this guarantee as a license to increase leverage to unmanageable levels, and the Company obtained a sovereign debt position on European debt of over $6.3 billion. So while the EFSF guarantee may have provided a safety net if the repo-to-maturity bonds defaulted, it did not prevent MF Global's exposure to margin calls when the value of the bonds fell. This massive exposure, and subsequent liquidity crisis that depleted the small amount of MF Global's available capital, is ultimately what destroyed the Company.

60.     Importantly, **MF Global lacked the liquidity to cover repo transactions with the Company's own resources**. As explained in a November 10, 2011 Thomson Reuters article, "MF Global Slayed By the Grim Repo," the enormous leverage used by MF Global created an exposure to risk that exceeded many times over its asset base, including transaction costs for carrying transactions with such high leverage:

Like Wall Street cocaine, leveraging amplifies the ups and downs of an investment; increasing the returns but also amplifying the costs. With MF Global's leveraged reaching 40 to 1 by the time of its collapse, it didn't need a Eurozone default to trigger its downfall – all it needed was for these amplified costs to outstrip its asset base. . . . With its balance sheet delicately teetering on the edge of a leverage cliff edge, all MF Global needed was a shove to fall to its financial ruin.

61.     Individual Defendants knew of or were reckless in disregarding this enormous exposure. For example, Corzine admitted that MF Global was leveraged approximately 31:1 and

16

admitted that MF Global faced liquidity demands that created stress resulting from its rating downgrades, poor earnings, and regulatory demands.  Corzine also admitted that MF Global needed to raise capital as a result of the disclosure of the magnitude of its positions in foreign sovereign debt, *i.e.*, the collateral used in the Repurchase Transactions to Maturity ("RTMs").

62.     According to Corzine's December 8, 2011 testimony, he and his board of directors, senior managers and traders, individually and collectively, decided and agreed to enter, on a highly leveraged basis, into highly risky transactions using off-balance sheet transactions in Euro-denominated bonds of distressed European countries.  Investigations and news articles have placed the leverage ratio at 40 to 1 after taking into account off-balance sheet repo transactions.

63.     During the December 13, 2011, hearing of the US Senate Agriculture Committee, Terrence Duffy, Executive Chairman of the CME Group, said that on October 31, 2011, at about 2 a.m., MF Global disclosed that commodities customers' segregated account funds had been transferred from MF Global's FCM business unit to MF Global's BD business unit.  Corzine subsequently admitted this to be true.

64.     Additionally, Defendants caused hundreds of millions of dollars or more of US client funds to be transferred around the world to meet other financial obligations of MF Global.  Throughout Corzine's tenure, MF Global intentionally moved assets from segregated client accounts in MF Global's FCM business unit into the general funds of MF Global's BD unit.  MF Global's BD business unit would then use the client's T-Bills (or the proceeds from borrowing against or selling them) to meet the general obligations of MF Global's BD business unit.

65.     According to a November 29, 2011 report in the New York Times, in response to JPMorgan' demands, MF Global transferred approximately $200 million from the Company's US Customer accounts to JPMorgan, to cover a shortfall in MF Global's foreign banking accounts.  According to a December 6, 2011 report in the Wall Street Journal, Corzine was warned from as early as September 2010, that MF Global lacked the necessary liquidity to cover its debts.  Rather than diligently investigating and mitigating this situation, the Individual

Defendants caused the Company to continue to increase its risk profile and exposure to distressed Eurozone debt.

**D.     The SEC Investigated MF Global's Repo Transactions**

66.     In March 2011 the SEC began investigating MF Global following a reference to repos in the Company's annual report, in which MF Global stated that, "[i]n the year ended March 31, 2011, we expanded our trading in repurchase agreements qualifying for sales accounting as there were opportunities available in the European market."  In MF Global's response to the SEC, written by MF Global's chief accounting officer Henri Steenkamp, MF Global claimed it was justified in treating repo-to-maturity transactions as sales on the basis that: "Repo-to-maturity agreements are different from other repurchase agreements in that the repurchase date is the same as the date when the transferred assets mature.  We account for repo-to-maturity transactions as sales."

67.     MF Global's justification for this treatment was that the repo-to-maturity assets were isolated from the company, the counterparty-transferee had the right to pledge or exchange the assets, and MF Global had relinquished control over the assets under Statement of Financial Accounting Standards No. 140 ("SFAS 140").

68.     Shortly thereafter, FINRA noticed that certain repurchase transactions to maturity were collateralized with European sovereign debt and, pursuant to SEC Rule 15c3-1, required that MF Global increase its net capital.  Having no choice, MF Global moved to increase its net capital to provide for available liquidity to cover margin calls from repos.  In May 2011, the Company announced that it was dramatically expanding its capital markets and institutional sales teams, including the acquisition of commodities personnel, and consolidating its various European offices in Geneva and London.

69.     According to MF Global's bankruptcy filings, the SEC then requested that MF Holdings announce the full extent of its long position in Eurozone sovereign debt.  The SEC moved slowly and by the time MF Global announced that it was long on $6.3 billion in Eurozone sovereign debt, its demise was imminent.

### E.     MF Global Is Caught Misappropriating Client Funds

70.     MF Global was required to make disclosures and file reports regarding the segregation of client funds, including any use of segregated client funds for proprietary trading. These disclosures include: (a) filings with the Designated Self-Regulatory Organization, the CME Group, and/or the National Futures Association "Daily Segregation Reports," (b) monthly and material-change "Segregated Investment Detail Reports," and (c) monthly SEC FOCUS and/or CFTC Form 1-FR-FCM reports and the accompanying Statements of Segregation Requirements and Funds in Segregation.  Each of these reports or disclosures falsely reported that none of MF Global's segregated client accounts had shortfalls when in fact they were deficient by as much as $1.2 billion or more.

71.     In the last week of October 2011, auditors from Chicago Mercantile Exchange Group began reviewing some of MF Global's Daily Segregation Reports.

72.     On October 24, 2011, CME Auditor Mike Procajilo ("Procajilo") spoke with Mike Bolan, MF Global's assistant controller.  Bolan informed Procajilo that MF Global was going to report a quarterly loss on the week's conference call, and that a ratings downgrade from Moody's was expected.  Moody's downgraded the Company's rating to junk status.

73.     On October 25, 2011, Kim Taylor, Terry Duffy and Craig Donohue – each senior managers at CME – heard about potential problems at MF Global stemming from over-the-counter activity.  Allegedly, Taylor spoke with Laurie Ferber, MF Global's general counsel, who falsely reassured Taylor that the statements were not accurate.  Meanwhile, the Company posted third quarter losses of $191.6 million.

74.     According to testimony and documents, on October 26, 2011, CME arranged a conference call with Ferber and Steenkamp, who each gave the CME representatives (Taylor, Anne Bagan, and Tim Doar) the false sense that MF Global was actively involved in conversations with customers and clients in an attempt to preserve the Company.

75.     On October 27, 2011, MF Global was downgraded to junk status by Fitch, and it drew down on its revolving lines of credit with JPMorgan.  CME thereafter arranged for a phone

call with MF Global Finance and Compliance Officers Stephen Hood, Dennis Klejna and Stockman and Steenkamp to discuss CME's concerns related to MF Global's liquidity.  Despite assurances of its sufficient liquidity and steps to reduce its distressed security inventory. Individual Defendants were keenly aware, MF Global was <u>not</u> taking appropriate steps to reduce distressed inventory, but instead was using off-balance sheet devices and misappropriating client funds to cover up the ongoing fraud.

76.     On <u>October 28, 2011</u>, MF Global continued to reassure CME and CFTC officials that the Company was stable and that they were close to executing a deal to sell the Company, or part of the Company, to a "very motivated buyer."

77.     On <u>October 29, 2011</u>, despite repeated requests, MF Global had still failed to provide all necessary documents to CME and CFTC officials relating to customer segregated accounts.  MF Global's Board of Directors held a hasty board meeting to discuss the sale of the Company's assets, including the "attractive" futures business.

78.     On <u>October 30, 2011</u>, Ferber and Bolan explained to CME auditors and CFTC officials that they had discovered what MF Global described as "an accounting error," and that it was on the "liability" side of the balance sheet.  On the evening of October 30, 2011, MF Global's treasurer called a meeting with the CME and CFTC and explained that the Company had a potentially huge deficiency in the segregated accounts due to an unidentified accounting mistake, or "mis-booking."  As a result, MF Global's clearing privileges at major commodities clearing organizations, including the CME, were suspended, and MF Global was put on "liquidation only" trading status.

79.     Later that same evening, CME Auditor, Procajilo, sent an email to Bagan stating that MF Global's explanation of the deficiency in segregated accounts "proved to be unsubstantiated."  Procajilo spoke with Serwinksi and MF Global Treasurer Edith O'Brien, who each repeated the same explanation that the deficiency must be an accounting error, and that the error was so large that it could not be anything but an accounting error.

**F.**     **MF Global's Actions Were Fraudulent and In Violation of Federal Regulations**

80.     According to the November 8, 2011, testimony of CME Group's Executive Chairman Terrance A. Duffy to the US House of Agriculture Committee, MF Global had **falsely reported** on Sunday, October 30, 2011, to the CFTC that the $900 million shortfall in commodities customers' segregated accounts was a so-called "accounting error."  No such "accounting error" existed, as confirmed by the CFTC and CME Group.

81.     As a FCM registered with the CFTC, MF Global was subject to the requirements of the CEA.  Specifically, Section 6(d)(a) of the CEA provides in relevant part:

> **It shall be unlawful for any person to engage as futures commission mercha**nt or introducing broker in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market or derivatives transaction execution facility unless –
>
> (2) **such person shall, if a futures commission merchant**, whether a member or nonmember of a contract market or derivatives transaction execution facility, **treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer. Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held** . . .

82.     While the CEA provides and Commissioner Jill E. Sommers of CFTC testified before the US House of Agriculture Committee on December 8, 2011, that **transactions using segregated <u>client</u> (or customer) funds are unlawful unless, in limited circumstances not applicable here, the FCM replaces the moved funds with appropriate collateral of equal value**.  In particular, because the assets taken from segregated <u>customer</u> accounts were cash, T-Bills or the equivalent, MF Global was required to replace the <u>customer</u> funds with similar assets of equal value.  Instead, the assets were either taken and replaced with nothing, or taken and replaced with something that was of substantially lower quality.  This taking of the funds from the segregated <u>customer</u> accounts violated 17 CFR § 1.25 and §6(d)(a) of the CEA.  The

21

deficiencies in segregated <u>customer</u> accounts is confirmed by the fact that as of this date, funds that should have been in the commodities clients' segregated accounts still have not been found, despite rigorous investigations by MF Global, the SIPA Liquidation Trustee's staff and forensic accounts, the CFTC and its investigators, the SEC and its investigators, the self-regulatory organization CME Group and its auditors, the FBI and others.

83.     On <u>October 31, 2011</u>, at 5:20 a.m. EDT, the SEC's Division of Trading and Markets contacted the President and CEO of the Securities Investor Protection Corporation ("SIPC") to inform him that MF Global was unable to meet its obligations to its customers, and that MF Global should immediately be placed in liquidation under Securities Investor Protection Act ("SIPA").  That day, the SIPC filed an application for the entry of a protective decree placing MF Global in liquidation under the SIPA.  The SIPC determined, based on information provided by the SEC, that MF Global was unable to make such computations as necessary to establish compliance with the requirements regarding financial responsibility under section 15(c)(3), and record keeping under section 17(a), of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78o(c)(3) and 78q(a) (2000), and SEC Rules 15c3-3, 17a-3, 17 C.F.R. §§ 240.15c3-3, and 240.17a-3, § 78eee(a)(3), and SIPA § 78eee(b)(1)(D).

84.     On <u>October 31, 2011</u>, at 7:18 p.m. EDT, Ferber suddenly announced to regulatory officials that MF Global had "discovered" a shortfall in MF Global's commodities customers' segregated account funds, a shortfall that Ferber downplayed by merely calling it "significant."

85.     Defendants still cannot explain the disappearance of an estimated $1.2 billion in client funds – including those belonging to Plaintiffs and class members.

**G.     <u>MF Global Misrepresented The Security of Customer Segregated Accounts</u>**

86.     The Individual Defendants caused Plaintiffs and class members to rely on the purported integrity of the segregated accounts.  From February 2011 continuously through October 31, 2011, MF Global distributed via internet transmission, mail, and hand delivery a uniform written document titled "Managed Futures Today Safeguarding Customers Through

Segregated Funds."  The document falsely promised all funds would be kept segregated and

secure even if MF Global was insolvent.  For example, the document stated that:

> **In recent years, many investors found out the hard way they have very little recourse to recover funds in the event of a financial firm's bankruptcy.  Although the Bernie Madoff "hedge fund" was by far the highest profile case, there were numerous less publicized bankruptcies and defaults at other firms and investments (including legitimate ones), in which investors found recouping remaining funds difficult or impossible.**  Sometimes it's a case of being the last in line of a long list of creditors, a problem that's compounded when customer funds aren't separated from a firm's funds.  Such 'commingled' funds might have been used to fund the firm's operating expenses or in its own trading.  If a firm enters bankruptcy, it can be very difficult or impossible to recover customer funds that were commingled in such a fashion.
>
> . . .
>
> **However, all futures trading accounts, including managed futures, have the advantage of specific industry rules that require the segregation of customer funds from the firm's own funds.  The practice of segregating customer funds protects investors in the event of default at the Futures Clearing Merchant (FCM), the industry term for futures brokerage firms licensed to trade on futures exchanges in the U.S. holding their account**.
>
> . . .
>
> **While FCM bankruptcies are rare**, they do occur.  In 2005, Refco Inc. and 23 of its unregulated subsidiaries filed for Chapter 11 bankruptcy protection.  However, Refco's regulated subsidiaries (where customers' futures trading and managed futures accounts resided) were unaffected and **customers were able to continue trading and managing their accounts**.

87.    In MF Global's Form 10-K, signed by Corzine and dated May 20, 2011 ("2011

10-K"), Corzine reassured the public that he and MF Global has control over MF Global's risk:

> Employees [of MF Global] are expected and encouraged to escalate incidents and any matters of concern to management and to our compliance and risk department in order to effectively manage risk.  Consequently, we have established – and continue to evolve and improve – a global enterprise wide risk management framework that is intended to manage all aspects of our risks.  The risk-management framework is designed to establish a global, robust risk-management environment through a strong governance structure that (i) defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific businesses and risk managers, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.

88.     Additionally, the 2011 10-K stated:

> Our Chief Risk Officer, who reports to our President and Chief Operating Officer, leads the risk department and monitors and reports on our risk matters, including regular reports to our Board of Directors and Audit and Risk Committee.  The Chief Risk Officer promotes company-wide adherence to MF Global's enterprise risk management framework and has global responsibility for monitoring and facilitating control of market, credit and operational risks.
>
> . . .
>
> Senior management takes an active role in the risk management process and expects employees to understand and comply with their delegated risk responsibilities, relevant risk policies, and compliance requirements. Additionally, employees are expected and encouraged to escalate risk incidents and any matters of concern to management in accordance with our internal escalation policy to promote timely risk-mitigation action by the appropriate personnel.

89.     In MF Global's Schedule 14A dated July 7, 2011 Proxy Statement, the Company further represented a sound state of affairs as they acknowledged:

> The Board has responsibility for providing direction and oversight for management of the Company's business and affairs, establishing the Company's long-term objectives and strategy while overseeing the Company's business performance and management, including risk management.
>
> . . .
>
> The Company's enterprise risk management approach flow from the Board, which determines the Company's risk appetite, and permeates through the Company via a culture that expects all employees to function as risk managers.  This approach involves a strong governance structure that clearly defines responsibilities, delegated authorities for risk control as well as risk-taking and documented policies designed to identify, measure, control and mitigate risk.
>
> . . .
>
> While the Audit and Risk Committee maintains primary risk management oversight, the full Board has retained responsibility for general oversight.
>
> . . .
>
> Senior management reviews and discusses the Company's risk issues at meetings of the enterprise risk management committee, which is chaired by the Chief Risk Officer.
>
> . . .
>
> **Management has communicated to every employee the importance of upholding the firm's core values, including their individual obligation to demonstrate and support a strong compliance culture, and to be sensitive to reputational risk issues and act in accordance with the highest ethical standards.**

24

90.     Finally, MF Global was required and failed to segregate client funds, including those of Plaintiffs and class members, in protected accounts.  CFTC Rule 1.20(a) underscores this fundamental precept:

> All customer funds shall be separately accounted for and segregated as belonging to commodity or option customers.  Such customers' funds when deposited with any bank, trust company, clearing organization or another futures commission merchant shall be deposited under an account name which clearly identifies them as such and shows that they are segregated as required by the [Commodities Exchange] Act and this part. . . . **No person . . . that has received customer funds for a segregated account . . . may hold, dispose of or use such funds as belonging to any person other than the option or commodity customers of the futures commission merchant which deposited such funds.**

91.     This principle is reiterated in a MF Global document provided to all Plaintiffs and all class Members clients titled "**Protecting Your Assets at MF Global**" which stated in relevant part:

> **To ensure the integrity of your funds, MF Global follows stringent rules to separate your futures transaction assets from those used to fulfill MF Global's own obligations or liabilities.**  We hold client assets in a separate account that is legally and physically distinct from our own accounts.  **This client asset account is subject to rigorous accounting processes as well as regulatory reporting and auditing.**
>
> . . .
>
> When you transfer assets to MF Global, we place these funds in an account at a **bank insured by the Federal Deposit Insurance Corporation (FDIC).**  The bank designates this account as a separate "client omnibus account" and keeps the assets in this account completely segregated from accounts that hold the funds and investments of MF Global.
>
> . . .
>
> **We preserve the distinction between your assets and ours by holding your cash and securities within special reserve bank accounts established for the exclusive benefit of clients.**  Exacting accounting standards and internal supervision protocols govern these accounts to protect the integrity of client assets and separate from those of MF Global.

92.     These statements confirm that the Individual Defendants knew they had individual obligations to assure the highest level of compliance with all applicable laws, regulations, standards and ethical obligations requiring that MF Global safeguard and protect its customers' segregated accounts.  Each Individual Defendant knew that those accounts could not be risked for the benefit of MF Global and each Defendant knew he or she had an obligation to

act if such accounts were placed at risk by anyone at MF Global.  Likewise, PwC and JPMorgan also knew that this duty existed.  The Defendants failed Plaintiffs and the other class members in performing each of these duties.

93.     Each Defendant knowingly abrogated his or her aforesaid duties to protect and maintain segregated customer accounts.  As a result, each Defendant violated applicable laws, and caused enormous damages to MF Global's commodities clients, including Plaintiffs and all other class members.

### H.     JPMorgan Failed to Perform Its Statutory Duties

94.     JPMorgan was positioned – as a clearing broker, custodian and counterparty – to detect MF Global's fraudulent activity and breaches of duty.  JPMorgan did not serve a ministerial role, simply pressing a button and executing trades.  Rather, JPMorgan's role involved more than serving as a mere conduit that simply executed routine transactions in mechanical fashion.  Rather, JPMorgan played an integral part of MF Global's relationship and agreement with its customers, including Plaintiffs and class members.  JPMorgan had such a large a stake in all sides of the transactions in question, it would have unquestionably noticed the depletion of customers accounts and thereafter should have investigated the circumstances of the transfers.  As a custodian and clearing broker, JPMorgan failed to establish policies, procedures, and controls to detect and report suspicious activity attempted or conducted by MF Global.  JPMorgan failed to do so, and instead aided and abetted MF Global's fraud, and walked away from the aftermath with a hefty profit.

95.     Instead of reviewing the activity in customer accounts and investigating the irregularities, JPMorgan played both sides of the deal.  It executed MF Global transfer orders, moving billions of dollars from <u>segregated customer</u> accounts <u>held at JPMorgan</u> to MF Global's <u>non-segregated accounts</u>; JPMorgan then accepted millions in payments made from the same MF Global' non-segregated accounts that were commingled with funds from Plaintiffs' and the class members' segregated accounts.  In executing both sides of the transaction, JPMorgan **had full**

**knowledge** of the fact that customer accounts were being depleted and JPMorgan should have investigated the circumstances of the transfers and then reported them.

96.    For example, JPMorgan: 1) failed to block a transfer of $200 million in segregated customer funds despite evidence of suspicious activity, thus allowing MF Global to conceal the wrongful transfer; 2) accepted the same $200 million suspicious payment from MF Global customer accounts to resolve a debt owed by the Company despite the fact that MF Global had a $213 million <u>deficit</u> in customer accounts; 3) failed to notify the customers or the proper regulatory bodies, including the CME, CFTC, and SEC, of the suspicious circumstances surrounding the $200 million transfer; 4) was entrusted as a custodian over billions of dollars of MF Global's customer's segregated accounts; 5) executed MF Global transfer orders, transferring billions of dollars from segregated customer accounts, which JPMorgan knew or had reason to know was unauthorized or unlawful; 6) demanded margin payments from MF Global to reduce JPMorgan's credit risk, despite the bank's suspicions that the payments may have come from customer accounts; 7) witnessed an alarming rate of customer withdrawals and redemptions in 2011 from MF Global customer accounts held at JPMorgan; 8) extended credit to MF Global as part of JPMorgan's corporate banking services, conducted due diligence on MF Global, including sending JPMorgan employees to monitor and/or inspect MF Global activities; 9) refused to clear trades for the Company when MF Global over drafted on lines of credit from JPMorgan, until the overdraft was resolved; 10) acted as a clearing broker in MF Global's tri-party repurchase agreements, making payment for MF Global on repurchase agreements, which MF Global traded in the billions; 11) collaborated closely and was actively involved with MF Global when the Company began to have financial difficulty in 2011; and 12) received monthly, quarterly, and yearly account statements that detailed the financial results of the Company and knew or should have known of the fraudulent conduct.

97.    The events and circumstances that JPMorgan was privy to should not only have triggered an investigation as the banker in charge of the account, but it should also have triggered the bank's anti-money laundering ("AML") monitoring system.  Long before the passage of the

27

USA Patriot Act in 2001, and with greater force after Congress passed the Patriot Act, banks such as JPMorgan were required to monitor their customers' transactions to detect and prevent money laundering and other suspicious activities. The Patriot Act reinforced this obligation and underscored the importance of implementing robust detection systems.

98.     Federal legislation and regulations have long required banks to have an AML program. One element of these systems is the monitoring of customer account activity in order to detect possible fraud, unauthorized commingling, or other improper activity. These requirements were first established by the Bank Secrecy Act ("BSA") and federal banking regulations. 31 U.S.C. § 5311; 12 C.F.R. § 208.63. All of the federal banking agencies have substantially identical requirements. Thus, those parts of JPMorgan under the supervision of the Office of the Comptroller of the Currency ("OCC") are also subject to the same obligations. The Patriot Act reinforced these obligations and underscored the importance of implementing robust detection systems to ensure that money launderers and terrorists would not be able to use the United States financial system to further their crimes.

99.     Section 352 of the Patriot Act along with the banking regulations, require financial institutions to institute an AML program that includes four pillars: (1) designation of an individual or individuals responsible for managing BSA compliance; (2) a system of policies, procedures, and internal controls to ensure ongoing compliance; (3) training for appropriate personnel; and (4) independent testing of compliance. 12 C.F.R. § 208.63.

100.     Financial institutions must also fully understand the business in which their customers are engaged. This duty, referred to as the responsibility to "know your customer," ("KYC") is critical to determining what activity was suspicious. 12 C.F.R. § 208.62. Institutions, monitoring account activity, need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest an illegal enterprise. The KYC duty pre-dated the Patriot Act. Not only was it suggested by such guidelines as the Federal Reserve's BSA Examination Manual of 1995 and Supervisory Letter on Private Banking Activities, SR 97-19 (SUP), but it was standard industry practice.

28

101.    This regulatory guidance directed financial institutions like JPMorgan to perform onsite visits to their clients, obtain and review financial statements to corroborate the amount and source of funds in customers' accounts.

102.    It was also standard industry practice for financial institutions to perform KYC on their clients.  Many financial institutions have entire departments devoted to this one task and to making sure KYC is performed thoroughly and is constantly monitored and recorded.  JPMorgan has a KYC department for each of its lines of business.

103.    The principal purpose of AML programs is to monitor customer account activity for possible fraud, money laundering, or other improper activity.  These monitoring requirements are premised on the fact that banks are often in the best position to identify and thwart potentially illegal activity with respect to their clients' accounts.  While JPMorgan may have created AML and KYC programs that facially met the requirements of the Patriot Act and related regulations, those programs were not effectively executed.

104.    The Office of the Comptroller of the Currency Bank Secrecy Act/AML Handbook identifies numerous "red flags" which may suggest potentially fraudulent conduct.  Financial institutions must be on the lookout for these red flags as part of their transaction monitoring procedures.  These warnings of potential illegal activity include: (a) unexplained repetitive or unusual patterns of activity; (b) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (c) spikes in customer activity with little or no explanation; and (d) wire activity with offshore banking or financial secrecy centers.  An entity with JPMorgan's expertise and resources would be capable of identifying the red flags at MF Global, including the commingling of segregated accounts without reasonable explanation. **This is especially true considering that in June 2010 JPMorgan has recently been fined £33.3 million by the United Kingdom's Financial Services Authority for improperly segregating and commingling client money with the firm's accounts**.

105.    As a matter of federal banking regulations and in accordance with the standard of care in the banking industry, JPMorgan was responsible for verifying the source and legitimacy

of large fund transfer transactions.  Indeed, the pattern and magnitude of the monetary transfers should have triggered an immediate investigation by JPMorgan's anti-money laundering units which would have discovered the fraud.  Either JPMorgan (a) followed applicable anti-money laundering regulations and best practices, discovered the fraud, and (nevertheless) continued to participate in the fraudulent scheme, or (b) intentionally turned a blind eye.

106.    JPMorgan should have questioned, and reported the problems with the funds.  The wire documents associated with the transfers from MF Global's various accounts, including those at JPMorgan that were used to satisfy the loans would have identified the origin of the accounts as segregated funds, and would have indicated a violation of applicable rules and guidelines triggering what actions (including reporting the activity) to take.

107.    As detailed above, JPMorgan played multiple and conflicting roles as the custodian, merchant, and banker for MF Global.  These services included, but were not limited to regulatory cash management; agent for a $1.2 billion loan to MF Global Holdings Ltd., and lender of a $300 million loan to the MF Global's broker-dealer entity.  In the days just prior to the collapse of MF Global, as the Company desperately drew down on its revolving lines of credit with JPMorgan, the Bank ensured that the $300 million loan was paid off with knowledge of or reckless disregard that the line of credit was satisfied through customer segregated funds, **including those from escrow accounts held by JPMorgan**.

108.    JPMorgan was also privy to numerous regulatory filings and reports that would have put the bank on further notice of irregularities at MF Global.  For example, MF Global, as a broker-dealer, was required under SEC Rule 17a-5 to file FOCUS Reports with the SEC. Additionally, under SEC Rule 17a-5(d), MF Global was required to file annual audited reports. Both the FOCUS Reports and the Annual Audited Reports require broker-dealers to list the amount of cash and assets on hand, as well as the liabilities of the broker-dealer.

109.    In MF Global's FOCUS report dated March 31, 2011, which was publicly available and signed by Defendant Serwinsky, MF Global listed nearly $8.5 billion in assets held at banks and clearing organizations, including JPMorgan.  JPMorgan not only received publicly

disseminated FOCUS Reports, but also served as custodian and clearing agent for MF Global. JPMorgan was, or should have been aware of any discrepancies in the amount of segregated funds, including the $1.2 billion that "disappeared" in 2011.  Additionally, MF Global was required to generate "Daily Segregation Reports," and monthly and material-change "Segregated Investment Detail Reports."  These reports and/or similar reports and metrics were available and would have or should have been reviewed by JPMorgan.

110.    With all of the information made available to JPMorgan, it was or should have been readily apparent to the bank that MF Global was commingling segregated customer accounts, these segregated accounts were not being replenished with the same quality assets, and that MF Global was overstating the amount of customer assets that were held in segregated accounts at JPMorgan.

111.    As stated above, MF Global's misconduct should also have been readily apparent to JPMorgan given its own recent and repeated failures to properly segregate customer funds.  In June 2010, JPMorgan was given a record fine of £33.3 million by the United Kingdom's Financial Services Authority ("FSA"), for failing to properly segregate billions of dollars of client money from the firm's accounts (an error that PwC failed to detect for seven years).  The regulator concluded:  "In the event of the insolvency of JPMorgan Securities, the risk to client money held by it … was unprecedented in scale … Had the firm become insolvent at any time during this period, this client money would have been at risk of loss."

112.    JPMorgan was privy to both public reports and private information – based on the bank's close relationship as custodian and clearing bank – to gain a very thorough understanding of MF Global's business and capital structure.  This included information regarding the excessive amounts of leverage that dwarfed the Company's asset base, as well as the deteriorating portfolio of Eurozone debt that was clogging MF Global's balance sheet.

113.    JPMorgan authorized special treatment for MF Global and knowingly or recklessly deviated from this standard of care by ignoring the mandatory fraud detection and anti-money laundering procedures regarding wire transfer protocols and repetitive movement of

large sums of cash (in the millions of dollars) in and out of various accounts, including MF Global's segregated customer accounts.

114.     On November 28, 2011, it was reported that some $200 million missing MF Global funds had "turned up" in JPMorgan's accounts in Britain.  According to reports, in the days leading to its bankruptcy, MF Global over drafted an account held with JPMorgan and the Bank demanded the $200 million to cover the shortfall.  On October 28, 2011, three days before MF Global's bankruptcy, MF Global transferred $200 million to JPMorgan, which retained the money despite the fact that at the time of the transfer, MF Global had only $26 million in cash on hand, nearly all of which was held in accounts with JPMorgan.  In fact, **emails uncovered by the Bankruptcy Trustee confirm that JPMorgan**, in an attempt to cover its tracks, wrote a letter to MF Global to confirm that the funds, which JPMorgan acknowledged came from customer accounts, was not a violation of applicable regulations.  MF Global never responded.

115.     On the heels of its own failure to properly segregate accounts, JPMorgan's demand and acceptance of $200 million of customer funds was simply its latest contravention of CEA and CFTC rules and regulations.

## I.     PwC, MF Global's Auditor, Provided False Reports

116.     PwC was, at all relevant times, the outside auditor for MF Global.  PwC knew, by virtue of the services it provided to MF Global, that the vast majority of MF Global's assets were concentrated in bonds issued by European countries.  It was thus reasonably foreseeable, and highly probable, considering the widespread media coverage of the European debt crisis, that a collapse of the European debt market would result in the business failure of MF Global.  Similarly, by virtue of the services provided by PwC, and PwC's access to accounting systems and personnel, PwC knew, or should have known that client funds were commingled with general MF Global funds, and that these funds were used to pay down the Company's obligations or were used as collateral to gain leverage.

117.     As an auditor, PwC knew it had a responsibility to review and report on customer segregated funds (under professional and regulatory rules see *infra*).

118.    Indeed, the accountancy profession's disciplinary body in the U.K., the Accountancy & Actuarial Disciplinary Board, recently said that after a lengthy investigation on another matter, it was initiating a formal complaint over PwC's role in preparing reports with JPMorgan, and would seek a record fine of £1.5 million ($2.33 million): "PwC did not carry out its professional work in relation to reports with due skill, care and diligence and with proper regard for the applicable technical and professional standards expected of it and consequently did not report that client money held by JPMorgan Securities' futures and options business was not segregated at all times in accordance with the … rules in force at that time."  PwC has admitted the Complaint's allegations.

119.    Similarly, PwC knew that the requirement that MF Global's customer assets be maintained and protected in customer-segregated accounts and "ring-fenced" from claims against the other segregated portfolios and MF Global's own obligations and/or portfolios was material to the fair presentation of MF Global's financial condition.  A failure to maintain this segregation of customer accounts supports the allegations that MF Global's representations regarding segregated accounts were false, and that MF Global placed those assets at substantial risk of loss, a fact that would have to be disclosed in MF Global's financial statements.  Thus, GAAS required that PwC plan and perform its audits of MF Global's financial statements in such manner as to obtain reasonable assurance that the Company's customer assets were in fact maintained and protected in such segregated and protected accounts, as required by the CEA and CFTC rules and regulations.

120.    During all relevant times, PwC issued clean audit opinions for MF Global, including the 2010 certified audit report incorporated in MF Global's 2010 10-K, published on May 28, 2011.

### 1.    PwC's Duties Pursuant to Professional Auditing Standards

121.    PwC was required to perform its audits in accordance with the Standards promulgated by the American Institute of Certified Public Accountants ("AICPA").  There are ten **Generally Accepted Auditing Standards** ("GAAS") promulgated by the AICPA: three

General Standards, three Standards of Field Work and four Standards of Reporting. Those standards are as follows:

### General Standards

1.   The audit must be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.   In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.

3.   Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

### Standards of Field Work

4.   The work is to be adequately planned and assistants, if any, are to be properly supervised.

5.   A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

6.   Sufficient competent evidential matter is to be obtained through inspection, observation, inquires and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

### Standards of Reporting

7.   The report shall state whether the financial statements are presented in accordance with Generally Accepted Accounting Principles.

8.   The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

9.   Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

10.  The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect than an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

120.    With respect to PwC's audit of MF Global, PwC violated the following principles

of GAAS:

        a.     **GAAS General Standard No. 3**, which requires the
auditor to exercise due professional care in the performance of the audit
and preparation of the audit report;

        b.     **GAAS Field Standard No. 1**, and the standards set forth in
AU sections 310, 320, 327 and others, by failing to adequately plan its
audit and properly supervise the work of assistants so as to establish and
carry out procedures reasonably designed to search for and detect the
existence of errors and irregularities which would have a material effect
upon the financial statements; and

        c.     **AU section 316**, which requires, inter alia, the auditor to
plan and perform its examination of the financial statements with
professional scepticism.  In particular, in MF Global's case, there were
numerous audit red flags and risk factors that alerted PwC to the potential
for commingling and looting of customer accounts, and PwC failed to
expand its audit procedures and perform effective audit testing to obtain
more reliable, persuasive audit evidence of such significant factors and
audit red flags.

121.    PwC also had a duty to comply with all of the Statements on Auditing Standards

("SAS"), which are issued by the Auditing Standards Board ("ASB") of the AICPA and

incorporated into GAAS.  GAAS required that PwC obtain an understanding of the business

organization and operating characteristics of MF Global sufficient for PwC to conduct its audits

in accordance with GAAS.

122.    GAAS further required that PwC evaluate the impact on the MF Global financial

statements of any failure of MF Global to comply with investment restrictions imposed by

contract or by governmental regulation. AICPA Audit and Accounting Guide, Audits of

Investment Companies ("AIC") § 5.72-75.  Among other things, a failure to comply with

governmentally imposed investment restrictions or requirements could constitute an illegal act,

AIC § 2.140, and must be disclosed in the financial statements.

      **2.**     **PwC Violated CFTC Rules**

123.    MF Global was a Futures Commission Merchant registered with the CFTC within

the meaning of the rules promulgated by the CFTC, specifically 17 C.F.R. § 1.3(p).  As such, MF Global was required to be, and was in fact, registered with the CFTC at all relevant times.

124.    CFTC rules applicable to CFTC registrants required that MF Global file audited financial statements with the CFTC and submit to a yearly audit conducted by the CFTC Joint Audit Committee.

125.    CFTC rules required that financial statements filed with the CFTC be "certified," meaning "audited and reported upon by an independent certified public accountant or independent licensed public accountant."  17 C.F.R. § 1.16(a)(3).  During the class period, PwC prepared MF Global's "certified" financial statements that were filed with the CFTC.

126.    The rules of the CFTC specifically require that audits: ". . . must be made in accordance with generally accepted auditing standards and must include a review and appropriate tests of the accounting system, the internal accounting control, and the **procedures for safeguarding customer and firm assets in accordance with the provisions of the Act and the regulations thereunder**, since the prior examination date. 17 C.F.R. § 1.16(d)(1)

127.    Additionally, CFTC Rule 1.16 states, under audit objectives: The audit must include reviews of the practices and procedures followed by the registrant in making . . . daily computations of the segregation requirements of section 4d(a)(2) of the Act and these regulations and the secured amount requirements of the Act and these regulations.  17 C.F.R. § 1.16(d)(3)

128.    As part of its planning for each of its audits of the annual financial statements of MF Global, PwC was required by GAAS to consider and evaluate the existence, operation and effectiveness of internal controls.  For MF Global, those controls included, but were not limited to, cash and securities reconciliations of customer accounts and the maintenance and protection of those assets in segregated accounts.

129.    GAAS also required that PwC report to MF Global's audit committee and/or board of directors any material weaknesses in internal controls identified during the audit.  Such weaknesses are known as "reportable conditions" and consist of "significant deficiencies in the design or operation of the internal control structure, which could adversely affect the

36

organization's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements."  AU § 325.02.

130.    Moreover, CFTC Rule 1.16(e) sets forth reporting requirements in the event PwC discovered a "material inadequacy" in MF Global's financial statement reporting system, including the system for monitoring segregated customer accounts.  A material inadequacy is defined in the CFTC rules as, *inter alia*, "any conditions which contributed substantially to or, if appropriate corrective action is not taken, could reasonably be expected to . . . [r]esult in violations of the Commission's segregation or secured amount (in the case of a futures commission merchant), recordkeeping or financial reporting requirements."  17 C.F.R. § 1.16(d)(2).  If PwC found a material inadequacy in MF Global's "accounting system, in the internal accounting control, in the procedures for safeguarding customer or firm assets," then PwC was required to "call such inadequacies to the attention of the applicant or registrant [MF Global], which has the responsibility to give notice to the National Futures Association and . . . or the Commission and the designated self-regulatory organization."  17 C.F.R. § 1.16(e)(2).

131.    PwC failed to perform the audit assurance and review that is required under GAAS and the CFTC rules relating to periodic reviews of MF Global's financial reporting systems, including the segregation of customer accounts.  By failing to perform the necessary work, or by choosing to disregard clear warning signs of unlawful commingling, PwC allowed the fraud to continue because PwC never reported anything to the MF Global board of directors, or the proper regulatory bodies, including the CFTC.

132.    PwC failed to obtain a reasonable basis for a clean audit opinion of MF Global's financial statements.  Specifically, PwC failed to obtain a sufficient basis to support the representation in MF Global's financial statements that assets were maintained in customer-segregated accounts. Had it done so, PwC would have known that the representation was false. PwC would also have known that MF Global's financial statements were materially false and misleading because they failed to disclose the excessive leverage, risk of insolvency and credit risk to which Plaintiffs' assets at MF Global were exposed.

133.    The CFTC has issued subpoenas to PwC relating to review and reports of MF Global's segregated customer funds.

**3.    Plaintiffs and Class Members Reasonably Relied on PwC's Misrepresentations**

134.    PwC knew and intended that MF Global customers would use and rely upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions, including decisions to continue to execute futures contracts through MF Global, to pledge assets as collateral in MF Global accounts, and to allow MF Global to continue to administer clients' assets.  Additionally, PwC knew that its reports on MF Global's financial statements and segregation of accounts would be reviewed by the CFTC.

135.    PwC owed Plaintiffs and class members the duty to refrain from conduct that PwC knew or should have known would be harmful to MF Global customers holding segregated accounts.  PwC also had a duty to refrain from aiding and abetting any breach of duty, including fiduciary duties, owed by MF Global to its customers.

136.    Customers and their agents, including Plaintiffs and class members, in fact relied upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions, including the decision to continue to retain MF Global as broker for futures contracts, and the decision not to demand the return of the assets or immediately request credit-risk protection of pledged assets in MF Global.  As a result of this reasonable reliance, Plaintiffs and class members have been damaged.

137.    As a result of the various auditing, advisory and tax services, as well as unfettered access to MF Global personnel and accounting systems, PwC was in a unique position and became aware of all the facts giving rise to fiduciary duties owed by MF Global and its agents to Plaintiffs and class members, including but not limited to the fact that MF Global was acting as custodian of class members' segregated funds.  PwC was required by CFTC rule 1.16(e)(2) to review, *inter alia*, MF Global's segregation activities and report any material inadequacies to MF Global, to the CFTC and to the CME.  17 C.F.R. § 1.16(e)(2).  PwC provided substantial

38

assistance thereto by failing to report unlawful commingling and/or looting of customer segregated accounts.

138.    Through its various auditing, advisory and tax services, PwC knowingly participated and substantially assisted in the tortious conduct and breaches alleged herein. Without these services, MF Global would have been unable to continue hiding its true financial condition long enough to complete its fraudulent scheme.  For instance, if PwC had reported the material inadequacies to the MF Global board or audit committee, or to the proper regulatory bodies, MF Global would have likely faced serious consequences, including heavy fines or suspension from trading activities.

139.    PwC knew or consciously avoided knowing that MF Global was commingling customer accounts and looting the client funds to pay off obligations including those related to distressed Eurozone Bonds.  If PwC had fulfilled its professional obligations, it would have investigated the segregated client accounts and uncovered the commingling of clients segregated accounts with money used to pay other MF Global obligations.  If PwC had fulfilled its professional obligations it would have thereafter advised the MF Global audit committee, board of directors, officers, agents and others of the ongoing fraud.  Instead, PwC chose to substantially assist the MF Global scheme.

140.    PwC knew or consciously avoided knowing that MF Global was commingling customer accounts and looting the client funds to pay off obligations including those related to distressed Eurozone Bonds.

**J.    Defendants Aided and Abetted MF Global's Breaches Of Fiduciary Duty**

141.    MF Global failed to safeguard Plaintiffs' and other class member's assets, which other culpable parties actively and knowingly aided and abetted.  MF Global's breaches of duty, which were authorized and encouraged by the Defendants listed above, resulted in the bankruptcy of the Company and caused the Plaintiffs and the class massive losses.

142.    At all relevant times, Defendants understood that Plaintiffs' and class members' funds were to be protected in customer-segregated accounts, as described in MF Global's

uniform offering and promotional materials, and as required by CEA and CFTC regulations.  MF Global breached its fiduciary and contractual duties to Plaintiffs and class members, and the Defendants knowingly aided and abetted in this breach by allowing and/or participating in the looting of Plaintiffs' and class members' accounts.

143.    As MF Global Officers at all relevant times, the Individual Defendants, owed fiduciary duties of care, duties of supervision that required them to safeguard customer assets, and duties of loyalty to place the interests of class members ahead of their own interests.

144.    Individual Defendants breached their duties by allowing customer funds to be transferred to and held in non-segregated accounts at banks, including JPMorgan.  Individual Defendants caused or knew MF Global was commingling segregated and non-segregated funds but allowed the movement of customer funds to occur, contrary to the interests of class members, to benefit MF Global and themselves.

145.    Once the Plaintiffs' and class members' assets were pledged to MF Global as collateral and secured in segregated accounts that Defendants assured were protected even in the event of MF Global's insolvency additional fiduciary responsibilities were assumed by the aiding and abetting Individual Defendants.  Plaintiffs and class members entrusted their assets to MF Global based upon this assurance and because MF Global was bound by the CEA and CFTC to maintain customer-segregation.  These segregated accounts were looted of more than a billion dollars. Accordingly, MF Global breached its fiduciary duties not to misuse customer assets. The Individual Defendants, because of their positions of authority within the Company aided and abetted these breaches, and did so with the knowledge of the breach.

146.    For instance, Corzine admitted to the US Senate Agriculture Committee on December 13, 2011, that the MF Global executives took the position that MF Global could, and in fact did, remove assets from a commodities client's segregated account – including those of Plaintiffs and other class members – into investments of the broker-dealer business unit.

147.    According to Corzine's December 8, 2011 testimony, he and the Board of Directors, senior managers and traders– individually and collectively, decided and agreed that to

enter, on a highly leveraged basis (according to Corzine's testimony, at a leverage ratio of 30.7:1), into highly risky transactions using off-balance sheet transactions in Euro-denominated bonds of distressed European countries.  Investigations and news articles have placed the leverage ratio even higher – at 40 to 1 – after taking into account off-balance sheet repo transactions.

148.    On October 31, 2011, at about 2 AM, MF Global disclosed that commodities customers' segregated account funds had been transferred from MF Global's FCM business unit to MF Global's BD business unit.  Corzine has subsequently admitted this to be true.

149.    MF Global's misuse of customer assets was done to fund MF Global's fraudulent operations and to conceal its true financial condition.  Specifically, the misuse was an attempt to hide the true leverage at the Company due to off-balance sheet repo transactions.

150.    Defendant JPMorgan aided and abetted MF Global's breach of fiduciary duty by receiving the funds and concealing their existence until nearly <u>one month</u> after MF Global's bankruptcy and liquidation began.

151.    In particular, JPMorgan aided and abetted the breach of fiduciary duty by Plaintiffs' fiduciary MF Global, by substantially assisting MF Global in maintaining class member funds in non-segregated accounts, extending credit, providing underwriting services and otherwise participating in MF Global's business, all with knowledge that customer assets, including Plaintiffs', were at risk in non-segregated accounts contrary to the representations in MF Global's account materials.  JPMorgan benefitted from MF Global's use of customer funds because it decreased JPMorgan's exposure to MF Global.

152.    Because of JPMorgan's close relationship with both MF Global and its position as a commodities market participant and an administrator for multiple commodities accounts, JPMorgan understood the customer- segregation, ring-fencing and other protections promised to class members, and at the same time understood that MF Global was not observing these protections and was commingling customer assets in MF Global's account at JPMorgan.

153.    JPMorgan knew and understood that MF Global owed various duties to Plaintiffs

41

and class members, and that these included the duties to take reasonable steps to ensure that class members' assets be maintained in customer-segregated accounts protected from the insolvency and credit risk of the custodian of those assets.

154.    JPMorgan actively promotes a commodity customer-segregated account service to provide customer-segregation for cash related to commodities trading, and thus understands regulatory requirements and customer-segregation issues relevant to such accounts.  JPMorgan understood that MF Global was entrusted with customer assets to be held in customer-segregated accounts.

155.    JPMorgan knew and understood that MF Global breached fiduciary duties it owed to Plaintiffs and class members by causing, assisting or knowingly allowing the transfer of class members' funds to MF Global's non-segregated account at JPMorgan, where those assets were exposed and subject to the insolvency and credit risk of MF Global.

156.    Despite its understanding that class members' assets were to be maintained in customer-segregated accounts and despite its understanding that Plaintiffs' assets were moved back and forth between MF Global's regulated accounts and MF Global's non-segregated accounts at JPMorgan, JPMorgan remained silent and indeed, actively concealed the problems.

157.    By facilitating transactions, extending credit, promoting MF Global securities offerings and otherwise participating in MF Global's business and operations, JPMorgan aided and abetted MF Global's fraud and breach of fiduciary duty.  JPMorgan was fully aware of MF Global's obligations to its customers in general and to class members in particular and was aware that MF Global was in breach of those obligations.  By actively participating in and profiting from MF Global's business, JPMorgan caused damages to Plaintiffs.

158.    Plaintiffs and class members relied upon PwC to identify irregularities relating to MF Global's business and assets.  PwC breached its professional duties by failing to conduct GAAS audits and to disclose that MF Global's segregated customer accounts were comingled. PwC represented that it had conducted GAAS audits and that MF Global's financial statements "fairly presented" MF Global's financial position, statements that were known by PwC to be

false.  MF Global breached its fiduciary duty, by failing to bring the comingled funds to the attention of MF Global's Audit Committee, MF Global's Board and the CFTC.  PwC aided and abetted in this breach by failing to do the same, or alternatively, by not conducting a GAAS and GAAP compliant audit given the numerous red flags, as described herein.

159.    In sum, at all relevant times, the Individual Defendants, PwC, and JPMorgan, willfully aided and abetted MF Global to: (1) wrongfully to acquire, divert and misuse Plaintiffs' and class members' funds to benefit itself and in violation of the protections designed to protect the plaintiff's and class members' funds; (2) wrongfully acquire, divert and misuse Plaintiffs' and class members' assets to increase leverage at MF Global's BD business operations and take risky bets on sovereign Eurozone debt; and (3) wrongfully to acquire, divert and misuse Plaintiffs' and class members' funds to pay down debt and other obligations, including millions in margin calls and other payments to JPMorgan.

## VI.    CLASS ALLEGATIONS

160.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes.  The Classes are defined as follows (collectively referred to as "Class"):

### Nationwide Class

All persons and entities nationwide who were damaged by the misappropriation of their funds as revealed when MF Global became the subject of liquidation and bankruptcy proceedings.

### Montana Class

All persons and entities in Montana who were damaged by the misappropriation of their funds as revealed when MF Global became the subject of liquidation and bankruptcy proceedings pursuant to the Ninth Claim (the "Montana Class").

161.    Excluded from the Class are the Defendants herein, and the subsidiaries, parents, affiliates, or controlled persons or entities of Defendants, as well as their family members, employees or representatives.

162.    Each of the class members have been affected by the Defendants' misconduct in

43

identical ways.  Under 11 U.S.C. § 766(h), a trustee in a commodity broker liquidation is required to distribute customer property held by the debtor ratably to its commodity customers on the basis and to the extent of each customer's net equity in their accounts.  Pursuant to CFTC rules, and consistent with SIPA, a trustee liquidating a commodity broker also has a duty to make immediate and best efforts to effect the transfer of open customer positions.  17 C.F.R. § 190.02(e)(1); 17 C.F.R. 190.6(e) and (f).  Despite distributions made and proposed to be made by the SIPA Trustee, there will be a shortfall in the funds and other property available for MF Global customers.  As discussed above, this shortfall was caused by the Defendants' failure to ensure compliance with the segregation and customer fund maintenance requirements of the CEA and CFTC regulations, and MF Global's own internal policies and procedures.

163.    The members of the Class are so numerous that joinder of all members in impracticable.  Plaintiffs are informed and believe that at least 38,000 futures accounts, which were required to be segregated, were unlawfully commingled.

164.    Plaintiffs' claims are typical of the claims of the members of the Class, as the Defendants served as officers of MF Global, or as custodians and trustees for class members' futures accounts, or served as auditor for MF Global and the claims are based upon similar conduct affecting all Class members.  Further, the claims made by Plaintiffs are typical of the claims of the class in that the provisions of the CEA and CFTC regulations which are alleged to have been violated apply equally and in the same respect to each class member, and Defendants are alleged to have violated those provisions in the identical ways.  Similarly, the claims arising out of MF Global's violations of its own internal policies and procedures, designed to ensure the safety and security of customer property, apply with equal force and in the same way to each class member, and Defendants failure to enforce those policies and procedures, and their conduct which aided and abetted a violation of those policies and procedures, was identical in all circumstances.

165.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class litigation.  Plaintiffs have no

44

interest that is contrary to or in conflict with those of the Class members which Plaintiffs seek to represent.

166.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

167.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among questions of law and fact common to the Class are:

a.    Whether MF Global violated the CEA and CFTC regulations by failing to segregate and separately maintain commodity customers' property

b.    Whether Defendants aided and abetted MF Global's violations of the CEA and CFTC regulations by failing to adopt and enforce proper policies and procedures to ensure the segregation and separate maintenance of customers' property;

c.    Whether MF Global violated the CEA and CFTC regulations by allowing using customer property for improper or illegal purposes;

d.    Whether the Defendants willfully aided and abetted MF Global's violation of the CEA and CFTC regulations by allowing or causing MF Global to use customer property for improper or illegal purposes;

e.    Whether MF Global had a fiduciary duty to ensure the safety and security of its customers' property;

f.    Whether MF Global breached its fiduciary duty by failing to ensure the safety and security of its customers' property

g.    Whether Defendants aided and abetted MF Global's breach of its fiduciary duty by failing to enforce MF Global's internal policies and procedures designed to ensure the safety and security of its customers' property, and/or willing MF Holdings and/or MFGI to improperly or illegally use MFGI's customer funds.

h.    Whether Defendants committed fraud;

i.    Whether Defendants converted and/or aided and abetted the conversion of funds;

45

j.      Whether Defendants violated the Montana Unfair Practices and Consumer Protection Act; and

k.      Whether class members were damaged and the measure of damages.

168.    The names and address of the Class members are available from the business records of Defendants as well as in the possession of the United States Bankruptcy Trustees. Notice can be provided to the Class members by first class mail and by using other techniques customarily used in class actions.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM
#### Aiding and Abetting Breach of Fiduciary Duty
#### Against All Defendants

169.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

170.    MF Global owed Plaintiffs and other class members fiduciary duties by virtue of: (1) special contractual obligations to maintain Plaintiffs' and other class members' funds in a segregated account, (2) statutory obligations to Plaintiffs and other class members under the CEA and rules promulgated by the CFTC, (3) a relationship of trust and confidence with Plaintiffs and other class members as a custodian, merchant, and broker operating on the Chicago Mercantile Exchange, and (4) the statutory designation of fiduciary for custodians under Montana § 32-1-425.

171.    As alleged in greater detail above, MF Global breached its fiduciary duty to Plaintiffs and class members by, among other things, (1) causing, authorizing or allowing the movement of Plaintiffs' and class members' segregated customer account funds to unprotected accounts at JPMorgan and other locations; (2) concealing the movement of Plaintiffs' and class members' funds to JPMorgan and other locations, and authorizing or allowing the dissemination of misleading segregation reports; (3) failing to ensure that Plaintiffs' and class members' funds were maintained in customer-segregated accounts; (4) exposing Plaintiffs' and class members'

46

segregated accounts to total or substantial loss in the event of a MF Global bankruptcy; and (5) self-dealing and causing MF Global to pay off the Company's debts and financial obligations by using Plaintiffs' and class members' segregated funds.

172.    Individual Defendants, JPMorgan, and PwC aided and abetted these breaches of fiduciary duty by active participation, substantial assistance, encouragement, and/or ratification of the breaches, and did so to further their own respective interests, which were to the detriment of Plaintiffs and the class.

173.    Because of Corzine's extensive control, discretion, and authorization over the wrongful conduct alleged herein, as well as his role as CEO and member of the Executive team, Corzine assumed a position of trust and confidence with Plaintiffs.  Additionally, according to sworn statements before the United States Senate, Defendants Serwinski and Simons were responsible for customer segregated funds and according to emails uncovered by the Bankruptcy Trustee and oversaw the transfer of $200 million of customer segregated funds to JP Morgan just before MF Global's bankruptcy.  But for these MF Global officers' actions and the responsibilities which they abrogated, MF Global could not have breached its fiduciary duty to Plaintiffs and the class.

174.    As alleged in greater detail above, PwC aided and abetted the breaches of fiduciary duty by, among other things, intentionally or recklessly failing to detect that MF Global and the Defendants had over-leveraged the Company, and that the financial reporting and control mechanisms established and practiced were insufficient to protect Plaintiffs' and the class members' statutorily mandated interests.  PwC was required by GAAS and CFTC Rules to review and report on MF Global's financial reporting systems, including the reporting systems for monitoring segregated customer accounts.  CFTC Rules further required PwC to review MF Global's daily segregation reports and to report any material inadequacies to MF Global, the CFTC, and the CEM.  Notwithstanding these rules and standards, PwC provided substantial assistance to MF Global and individual Defendants by providing assurance or clean reviews for materially false and reckless financial documents, and by failing to disclose MF Global's true

47

financial position.

175.    PwC also aided and abetted MF Global's breach of fiduciary duty by issuing an unqualified audit opinion on MF Global's financial statements for the year ending May 20, 2011. The audit report, which allowed for and furthered MF Global's breaches, should not have been issued under GAAP and GAAS.

176.    As alleged in greater detail above, JPMorgan was aware of and understood that the movement of Plaintiffs' and class members' funds to non-segregated accounts at JPMorgan and other financial institutions constituted a breach of MF Global's fiduciary duties.  JPMorgan was well-positioned, as a clearing bank and custodian of MF Global's segregated customer accounts, and had access to relevant customer information, through MF Global's FOCUS reports and wire transfer documentation, to gain extensive knowledge of the mechanics and results of MF Global's commingling and looting of segregated customer accounts.  As a result of these various sources of relevant information JPMorgan was aware of, or should have been aware of, the unusual activity and depletion of segregated customer accounts.  This unusual activity should have warranted an investigation by the JPMorgan bankers assigned to MF Global, and triggered the bank's AML duties, as well as other contractual and statutory duties.

177.    JPMorgan substantially assisted MF Global in breaching its fiduciary duties to Plaintiffs and the Class by arranging and participating in the movement of Plaintiffs' and the class members' assets to unprotected accounts at JPMorgan as well as other financial institutions. The commingling of Plaintiffs' and other class members' assets was known to be for non-customer and instead for MF Global's general business operations, including the reduction of MF Global's exposure to loans from JPMorgan, and the satisfaction of margin calls by JPMorgan for repos and other trades.  JPMorgan was aware of this because it acted as counterparty to MF Global, custodian of MF Global assets, and creditor to MF Global. JPMorgan and MF Global both knew that these customer funds, including those of Plaintiffs and other class members, were taken in a breach of MF Global's fiduciary duty.

178.    At all relevant times, Plaintiffs and the class members were unaware that (1) MF

48

Global breached its fiduciary duty to Plaintiffs and the class; and (2) Plaintiffs' and class members' segregated funds were commingled with MF Global's non-segregated funds and distributed to JPMorgan and others to satisfy and cover MF Global's financial obligations.

179.    At all relevant times, Plaintiffs and class members, had they known of the breaches of fiduciary duty, could have, and would have demanded redemption of funds from commingled accounts, demanded stronger contractual protections or more favorable terms, and/or terminated their accounts with MF Global and transferred funds to different financial institutions.

180.    Each Defendant affirmatively aided and abetted or conspired in the breaches of fiduciary duty by one another, and each are therefore liable for the damages thereto.

181.    Following MF Global's bankruptcy filing and subsequent freezing of client segregated accounts, class members were left having to post additional collateral to a new broker, just so that they could close their market positions and not incur penalties.

182.    The breaches of fiduciary duty by Defendants were the direct and proximate cause of the damages suffered by Plaintiffs and the class members, in an amount to be proven at trial.

183.    By virtue of Defendants' conduct in aiding and abetting MF Global's breaches of its fiduciary duty, Plaintiffs and the class members suffered damages in an amount to be determined at trial.

## SECOND CLAIM
### Conversion
### Against the Individual Defendants

184.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

185.    Plaintiffs and other members of the class had the right to possess their accounts with MF Global and the funds in them.

186.    Defendants, jointly and severally, without authorization intentionally interfered, possessed, and excluded Plaintiffs' and other class members' property rights in their assets by (1) arranging and participating in the movement of Plaintiffs' and all class members segregated

49

account funds to unprotected accounts and (2) diverting these funds to finance MF Global's operations.

187.     Defendants' interference deprived Plaintiffs and the class of possession and/or use of their accounts with MF Global and the funds in them.

188.     Following MF Global's bankruptcy filing and subsequent freezing of client segregated accounts, Plaintiffs and class members were left having to post additional collateral to a new broker, just so that they could close their market positions and not incur penalties.

189.     Defendants' interference damaged Plaintiffs and all members of the Class.

190.     Defendants, jointly and severally, converted portions of Plaintiffs' and all other class members' accounts, including the funds within them, in an amount to be determined at trial.

191.     These Defendants are also liable for punitive damages, as their conscious and deliberate disregard of Plaintiffs' and all class members' rights alleged in detail above were accompanied by actual malice and/or a wanton and wilful disregard of class members' rights.

**THIRD CLAIM**
**Aiding and Abetting Conversion**
**Against All Defendants**

192.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

193.     Plaintiffs and other members of the class had the right to possess their accounts with MF Global and the funds in them.

194.     Defendants, jointly and severally, intentionally interfered to the exclusion of Plaintiffs' and other class members' property rights in their assets by (1) arranging and participating in the movement of Plaintiffs' and all class members' segregated account funds to unprotected accounts and (2) diverting these funds to finance MF Global's operations.

195.     Individual Defendants had actual knowledge of the conversion of customer assets as alleged herein, owing to the special circumstances of their positions with regards to MF Global.  Alternatively, these Defendants consciously avoided knowledge of the conversion.

196.     As set forth in greater detail above, PwC gave substantial assistance to the

conversion of customer assets by MF Global by issuing clean audit opinions on MF Global's
books and records and helping conceal the MF Global fraud, preparing MF Global's tax
statements, advising MF Global on financial matters and preparing and approving MF Global's
financial statements and public filings in connection with its securities offerings, despite
knowledge that MF Global was misappropriating its customers' assets.  PwC was required by
GAAS and CFTC Rules to review and report on MF Global's financial reporting systems,
including the reporting systems for monitoring segregated customer accounts.  CFTC Rules
further required PwC to review MF Global's daily segregation reports and to report any material
inadequacies to MF Global, the CFTC, and the CEM.  Notwithstanding these rules and
standards, PwC provided substantial assistance to MF Global and individual defendants by
providing assurance or clean reviews for materially false and reckless financial documents, and
by failing to disclose MF Global's true financial position.

197.    PwC further gave substantial assistance to the conversion of Plaintiffs' and class
members' assets by issuing unqualified audit opinions on the financial statements of MF Global,
which concealed and failed to disclose the MF Global fraud and the deposit of substantial and
material amounts of Plaintiffs' and class members' assets in non-segregated and unregulated
accounts.

198.    As set forth in greater detail above, JPMorgan acted as custodian of MF Global's
segregated customer accounts, counterparty to MF Global's risky trades, and as one of MF
Global's larger creditors.  JPMorgan gave substantial assistance to the conversion of customer
assets by MF Global by effectuating transfers of customer cash into and out of MF Global's
commingled accounts.  For example, JPMorgan used customer assets to satisfy MF Global's
obligations to JPMorgan, assisting MF Global with its securities offerings, and extending $1.5
billion in loans to MF Global.

199.    Defendants' interference deprived Plaintiffs and the class of possession and/or use
of their accounts with MF Global and the funds in them.

200.    Defendants, with knowledge of Plaintiffs and class members' rights and the

interference therewith, substantially assisted the conversion of Plaintiffs' and class members' property by instigating, allowing, authorizing, and/or failing to prevent and thereafter concealing the movement of Plaintiffs' and all class members' segregated account funds in an amount to be proven at trial.

**FOURTH CLAIM**
**Fraud**
**Against Individual Defendants**

201.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

202.     Defendants made uniform written false and misleading statements to Plaintiffs and class members as alleged in detail above.  These Defendants' statements were fraudulent, material, and made with knowledge of their false and misleading character, or with reckless indifference to their truth or falsity.  The statements were made with the intention and expectation that Plaintiffs and class members would rely on them or, in the case of omissions, that customers would be ignorant of them in placing their property in MF Global accounts.

203.     Defendants failed to disclose numerous material facts including that regulated, protected, customer-segregated accounts at MF Global could be depleted and the funds moved to unprotected, unregulated, non-segregated accounts.  These knowingly false statements fraudulently induced Plaintiffs and class members to enter into contracts with MF Global, or its predecessor Man Financial.  At all times, Plaintiffs and class members were ignorant of the true facts.

204.     The Defendants had reason to expect that the Plaintiffs and class members would rely on the misrepresentations and omissions.  Plaintiffs and class members were entitled to and did reasonably rely on these misrepresentations and omissions, in their decision to place their property in customer accounts with MF Global.  Plaintiffs and all class members reasonably relied on the separateness of their segregated customer accounts and the regulations and protections that accompanied these accounts.

205.     Had Plaintiffs and class members known that their funds would not be segregated

52

or protected, but instead used by MF Global for its own benefit at the risk of and to the detriment of Plaintiffs and class members, they would not have placed their funds with MF Global. Plaintiffs and class members were fraudulently induced to place their funds with MF Global and therefore the contractual provisions between MF Global or its predecessor and Plaintiffs and class members are unenforceable.

206.    By reason of Plaintiffs' and the all class members' reasonable reliance on the Defendants' misrepresentations and omissions, and as a direct and proximate result of the wrongful conduct, Plaintiffs and the class have suffered damages, in an amount to be proven at trial.

207.    These Defendants are also liable for punitive damages, as their conscious and deliberate disregard of Plaintiffs' and all class members' rights alleged in detail above were accompanied by actual malice and/or a wanton and wilful disregard of class members' rights.

### FIFTH CLAIM
### Negligent Misrepresentation
### Against Individual Defendants

208.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

209.    In order to induce the Plaintiffs and class members to acquire customer accounts, the Individual Defendants negligently made misrepresentations and withheld material facts in the customer account documents and public oral statements.

210.    The Individual Defendants made numerous false and misleading statements regarding the segregation of the customer accounts.  These statements were negligent, material, and made with actual knowledge or reckless indifference to their truth or falsity, with the intention and expectation that Plaintiffs and all class members would rely on them.

211.    The Individual Defendants' negligent misrepresentations are set forth more fully above, and include, among others, that customer accounts were regulated, protected, and segregated.

212.    The disclosures and materials containing misrepresentations and omissions were

53

made by the Individual Defendants with the purpose of inducing investors to place their property in MF Global customer accounts and Plaintiffs and class members were unaware of the falsity of the representations.

213.     Plaintiffs and class members reasonably relied on the misrepresentations and omissions before entering into MF Global customer accounts.

214.     As a direct and proximate result of the misrepresentations and omissions, Plaintiffs and all class members have suffered damages in an amount to be determined at trial.

**SIXTH CLAIM**
**Interference With Contract Rights**
**Against the Individual Defendants and JPMorgan**

215.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

216.     Plaintiffs and all class members deposited money, securities and property in accounts pursuant to written contracts to secure, margin and/or guarantee trades and/or contracts of Plaintiffs and class members.  Plaintiffs and all class members had valid contract rights with MF Global that MF Global would treat their money, securities and property in their accounts as belonging to Plaintiffs and class members.  Plaintiffs and all class members had contractual rights that the money, securities and property in their accounts would be separately accounted for and not commingled with or be used to margin or guarantee trades.

217.     As alleged in greater detail above, Individual Defendants and JPMorgan were each aware of contractual agreements that Plaintiffs and class members had with MF Global to manage their accounts.

218.     As alleged in greater detail above, there was a valid contractual relationship between MF Global and Plaintiffs.  Individual Defendants and JPMorgan intentionally interfered with the performance of the contract by, among other things, causing the contract to be breached by allowing segregated funds to be improperly employed, allowing Plaintiffs' and class members' money to be commingled, and concealing these facts from Plaintiffs.

219.     As alleged in greater detail above, Individual Defendants and JPMorgan

54

intentionally interfered with the performance of each contract by causing the movement of funds from protected accounts at MF Global to unprotected, non-segregated accounts at JPMorgan.

220.    The above-described intentional interference with the contractual relationships of MF Global with Plaintiffs and class members was without justification or excuse.

221.    Defendants' tortious interference damaged Plaintiffs and all class members in an amount to be determined at trial.

**SEVENTH CLAIM**
**Violations of the Commodity Exchange Act**
**Fraud: 7 U.S.C. § 6b(a)**
**Against the Individual Defendants**

222.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

223.    Plaintiffs and class members deposited funds in accounts registered with the US Commodities Futures Trading Commission in connection with contracts of sale (and/or options on such contracts) for future delivery of commodities.

224.    Under 7 U.S.C. § 25(a)(1), any person who violates the Commodity Exchange Act, or who wilfully aids, abets, counsels, induces, or procures the commission of a violation of the CEA shall be liable for actual damages from one or more actionable transactions, specified in §§ 25(a)(1)(A)-(D), and caused by such violation, to any other person who made such transactions.

225.    The Individual Defendants participated in actionable commodities transactions, as set forth in 7 U.S.C. § 25(a)(1)(b), by soliciting contracts of sale of commodities for future delivery, for and on behalf of Plaintiffs and class members.

226.    The Individual Defendants participated in actionable commodities transactions, as set forth in 7 U.S.C. § 25(a)(1)(b), by receiving deposits, money, securities, or property from Plaintiffs and class members in connection with a contract of sale of commodities for future delivery.

227.    By their conduct described above, Defendants have violated one or more of the CEA provisions.  Alternatively, the Defendants have willfully aided, abetted, counseled,

55

induced, or procured the commission of one or more violations of the CEA.

228.   By the conduct described above, the Defendants cheated or defrauded Plaintiffs and class members, and/or attempted to cheat or defraud Plaintiffs and class members in violation of 7 U.S.C. § 6b(a)(2)(A).  Specifically, Defendants made misrepresentations and omissions, described above, regarding the segregation and security of customer accounts.

229.   Moreover, Defendants willfully made or caused to be made false reports or statements, including filings with the Designated Self-Regulatory Organization, the CME Group, and/or the National Futures Association "Daily Segregation Reports," (b) monthly and material-change "Segregated Investment Detail Reports," and (c) monthly SEC FOCUS and/or CFTC Form 1-FR-FCM reports and the accompanying Statements of Segregation Requirements and Funds in Segregation.

230.   By sending these statements, Defendants entered or caused to be entered, on investors' behalf, a false record of the segregation of customer accounts.  These false statements and records violated 7 U.S.C. § 6b(a)(2)(B).

231.   By making the misrepresentations and omissions described above, Defendants willfully deceived or attempted to deceive Plaintiffs and class members regarding the segregation of funds used as collateral in futures contracts and the disposition or execution of such contracts, in violation of 7 U.S.C. § 6b(a)(2)(C).

232.   Plaintiffs and class members reasonably relied on these misrepresentations and omissions, and the false statements sent by Defendants to Plaintiffs and class members.

233.   As a direct and proximate result of Defendants' conduct as described herein, Plaintiffs and class members have suffered damages in an amount that will be proven at trial.

/ / /

/ / /

/ / /

/ / /

/ / /

## EIGHTH CLAIM
### Violations of the Commodity Exchange Act
### Aiding and Abetting
### Against All Defendants

213.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

214.     In misappropriating Plaintiffs' and class members' account funds at MF Global, the Individual Defendants and JPMorgan wilfully aided and abetted MF Global's violations of the CEA.

215.     Section 25(a)(1) of the CEA provides in relevant part:

"(1) Any person (other than a registered entity or registered futures association) who violates this Act [7 USCS §§ 1 et seq.] or who wilfully aids, abets, counsels, commands, induces, or procures the commission of the Act [7 USCS §§ 1 et seq.] shall be liable for actual damages shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person –

* * * * *

(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract

216.     The Individual Defendants and JPMorgan arranged for and executed the movement of Plaintiffs' and the class members' assets to unprotected accounts at JPMorgan and other financial institutions.  The commingling of Plaintiffs' and other class members' assets was known to be for use in MF Global's general business operations, including the reduction of MF Global's exposure to loans from JPMorgan, and the satisfaction of margin calls by JPMorgan for repos and other trades.  JPMorgan was aware of this because it acted as counterparty to MF Global, a clearing broker for MF Global, custodian of MF Global assets, and creditor to MF Global.  The Individual Defendants were each in the capacity and position within MF Global to authorize, approve, endorse or monitor the transfer of Plaintiffs' and class members' assets.

217.     JPMorgan and the Individual Defendants knew that these customer funds, including those of Plaintiffs and other class members, were taken in a violation of the

57

requirements for segregation and commingling under the CEA and CFTC rules, and that they would likely never be returned.  JPMorgan is a sophisticated financial entity, registered broker-dealer, and certainly aware of the applicable rules and regulations under the CEA, CFTC, SEC and other regulatory bodies.  Likewise, the Individual Defendants are sophisticated finance executives with decades of experience both managing and directing the day to day activities at financial institutions.  However, JPMorgan and the Individual Defendants did nothing to prevent or cure these violations of the CEA and CFTC because they were more concerned with transforming MF Global into a prestigious Wall Street firm, receiving salaries, bonuses, or fees, margin calls, and loan payments from MF Global, which consisted in part of Plaintiffs' and class members' funds.

218.     Each of the Plaintiffs and class members opened commodity futures trading accounts with MF Global or its predecessor and deposited money, securities or other property in connection with the placement of orders for commodity futures contracts.

219.     MF Global violated segregation and customer funds maintenance requirements of section 6d of the CEA and the CFTC regulations promulgated there under by, among other things: (a) Failing to treat and deal with all money, securities, and property received by it to margin, guarantee, or secure the trades or contracts of its customers, or accruing to its customers as the result of such trades or contracts, as belonging to such customers; and (b) Failing to segregate and separately account for and not commingle its customer funds with the funds of MF Global or their securities customers, or to use such funds and property to margin or guarantee the trades or contracts, or to secure or extend the credit, of MF Global or any other customer or person other than the customer for whom the property was held.

220.     PwC gave substantial assistance to these violations by issuing clean audit opinions on MF Global's books and records and helping conceal the MF Global fraud, preparing MF Global's tax statements, advising MF Global on financial matters and preparing and approving MF Global's financial statements and public filings in connection with its securities offerings, despite knowledge that MF Global was misappropriating its customers' assets.

58

221.    PwC was required by GAAS, CEA, and CFTC Rules to review and report on MF Global's financial reporting systems, including the reporting systems for monitoring segregated customer accounts.  CFTC Rules further required PwC to review MF Global's daily segregation reports and to report any material inadequacies to MF Global, the CFTC, and the CEM. Notwithstanding these rules and standards, PwC provided substantial assistance to MF Global and individual defendants by providing assurance or clean reviews for materially false and reckless financial documents, and by failing to disclose MF Global's true financial position. PwC further gave substantial assistance in violation of the CEA by issuing unqualified audit opinions which failed to disclose the MF Global fraud and the deposit of substantial and material amounts of Plaintiffs' and class members' assets in non-segregated and unregulated accounts.

222.    Defendants willfully aided and abetted MF Global's violations of the CEA and CFTC regulations by knowingly and intentionally: (a) Failing to implement and enforce policies and procedures which would insure that class members' property, deposited for commodity futures trading, would be treated as belonging exclusively to such customers; (b) Failing to implement and enforce policies and procedures which would insure that MF Global segregated and separately accounted for MF Global's commodity customers' property; (c) Failing to implement and enforce policies and procedures which would insure that MF Global did not commingle its commodity customers' funds with the funds of MF Global, its entities or s securities customers; (d) Failing to implement and enforce policies which would insure that MF Global did not use its commodity customers' funds to margin or guarantee the trades or contracts, or to secure or extend the credit, of MF Global, and/or any other customer or person other than the customer for whom the property was held; and (e) Allowing MF Global to use commodity and derivative customer funds to margin or guarantee the trades or contracts, or to secure or extend the credit, of MF Global, or other customers or persons other than the customers for whom the property was held.

223.    As a result of the foregoing, the defendants, jointly and severally, are liable pursuant to 7 U.S.C. §§ 13c(a) & 25(a)(1), to Plaintiffs for violations of the CEA and for actual damages resulting therefrom.

### NINTH CLAIM
### Violations of the Montana Unfair Trade Practices and Consumer Protection Act Against Individual Defendants

224.    Plaintiffs repeat and reallege and incorporate the above paragraphs as if set forth fully herein.

225.    Plaintiffs' and Montana class members' funds constituted trade or commerce under the Act and are consumers within the class of persons protected by the Montana Unfair Trade Practices and Consumer Protection Act.  Mont. Code. Ann. § 30-14-101, et seq.

226.    Defendants' acts and conduct as described herein constituted deceptive acts and practices in the conduct of a business or in the furnishing of a service, with the meaning of the Montana Unfair Trade Practices and Consumer Protection Act, and as such, are unlawful.

227.    Plaintiffs and Montana class members did not know, and could have had no reason to suspect Defendants' unlawful and deceptive practices and/or acts prior to entering into a relationship with the Defendants.

228.    The acts and conduct of Defendants may and likely were repeated at all material times.

229.    The acts and conduct of Defendants were done knowingly or intentionally, and these acts affected the public interest, as defined in the Montana Unfair Trade Practices and Consumer Protection Act.

230.    As a result of Defendants' unlawful acts and conduct in violation of the Montana Unfair Trade Practices and Consumer Protection Act, Plaintiffs and Montana class members have has been damaged in an amount to be determined at trial and are entitled to treble damages and attorneys fees.

**VIII.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

1.      For an Order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class members;

2.      Compensatory, general, special and exemplary damages according to proof;

3.      Restitution and disgorgement of profits;

4.      Prejudgment interest at the maximum legal rate;

5.      Costs of the proceedings herein;

6.      Reasonable attorneys' fees and threefold actual damages as a result of Defendants violations of the Montana Unfair Trade Practices and Consumer Protection Act;

7.      All other and further relief at law or in equity as the Court deems just.

**IX.   JURY DEMAND**

Plaintiffs, pursuant to Fed. R. Civ. P. 38, demand a jury trial on all issues so triable.

Dated: January 9, 2012                                    Respectfully submitted by:

/s/ *Mark A. Baker*                                          /s/ *Matthew K. Edling*
Mark A. Baker                                                Joseph W. Cotchett (*Pro Hac Vice*)
Cory J. Swanson                                              Mark C. Molumphy (*Pro Hac Vice*)
**ANDERSON, BAKER & SWANSON,**          Nancy L. Fineman (*Pro Hac Vice*)
**PLLC**                                                     Matthew K. Edling (*Pro Hac Vice*)
One South Montana Avenue, Ste. L-1             **COTCHETT, PITRE & McCARTHY, LLP**
Helena, MT 59601                                         840 Malcolm Road, Suite 200
Telephone: (406) 449-3118                           Burlingame, CA 94010
Facsimile: (406) 449-0667                            Telephone: (650) 697-6000
                                                                       Facsimile: (650) 697-0577

*Counsel for Plaintiffs and the Proposed Class*   *Counsel for Plaintiffs and the Proposed Class*

61